FOURTH DIVISION

April 17, 2003

No. 1-02-0594

CHARLES FOSTER BROWN III, ) Appeal from
 

HEIDI HALL JONES, and NED OCHILTREE, JR., ) the Circuit Court

in Their Capacity as Trustees of the Meyer ) of Cook County.

Family Foundation, )   

) 

Plaintiffs/Counter-defendants-Appellees, ) 

) 

)  

) 

v. )  No. 99 CH 17008 

)

JIM RYAN, Attorney General of the State of Illinois, )

on Behalf of the Beneficiaries of the Meyer )

Family Foundation, an Illinois Charitable Trust, ) Honorable
  

) Patrick E. McGann,
   

Defendant/Counter-plaintiff-Appellant. ) Judge Presiding.
   

)         

) 

PRESIDING JUSTICE THEIS delivered the opinion of the court:

Plaintiffs, Charles Foster Brown III, Heidi Hall Jones, and Ned Ochiltree, Jr., in their capacity as trustees of the Meyer Family Foundation (the Trustees), sought a declaratory judgment that the plain language of the Meyer Trust Agreement (the Trust Agreement) permitted them to terminate the Meyer Family Foundation (the Trust) and distribute the 
corpus
 of the Trust to the Oakleaf Foundation, under which the Trustees would serve as some of its fiduciaries.  Defendant, the Attorney General of the State of Illinois, on behalf of the beneficiaries of the Meyer Family Foundation (the Attorney General), filed a two-count counterclaim.  He alleged that the proposed distribution violated the terms of the Trust Agreement, was a breach of the Trustees' fiduciary duty, and that the Trustees had unclean hands.   After a bench trial, the trial court granted judgment in favor of the Trustees on their declaratory judgment action provided that certain modifications were made to the articles of incorporation and the bylaws of the newly established Oakleaf Foundation.  Additionally, the trial court entered judgment against the Attorney General on his counterclaim, finding that the Trustees had not acted contrary to the Trust Agreement.

On appeal, the Attorney General contends that (1) the distribution to the Oakleaf Foundation violates the unambiguous terms of the Trust Agreement; (2) where the trust beneficiaries affirmatively requested that the Trust terminate, the Trustees must follow that directive and terminate their relationship with the Trust 
corpus
; (3) the Oakleaf Foundation causes indeterminate and unnecessary administrative costs that would be avoided by a direct distribution to charity; and (4) the Trustees cannot be permitted to extend their control over the Trust 
corpus
 through the Oakleaf Foundation because they have unclean hands.  For the following reasons, we affirm the judgment of the circuit court.

BACKGROUND

On December 23, 1946, C. Louis Meyer (the Grantor) established the Meyer-Ceco Foundation, also known as the Meyer Family Foundation, by a written Trust Agreement between himself, and his wife, Mary Luman Meyer, his daughter, Mary Elaine Meyer Moseman, and an employee of his company, J. Edmond Grogan, as trustees.  The Agreement was executed in Nebraska.  The Meyer Family Foundation is now an Illinois charitable trust pursuant to the Charitable Trust Act (the Act) (760 ILCS 55/1 
et
 
seq.
 (West 2000)).  Since 1969, the Foundation has also been administered as a private foundation within the meaning of section 509(a) of the Internal Revenue Code of 1986 (the Revenue Code) (IRC §509(a) (2003)), and is a tax-exempt organization as provided by section 501(c)(3) of the Revenue Code (IRC §501(c)(3)(2003)).  The Trust was originally funded with $1,000 and the assets have grown to over $12 million. 

The powers and duties of the Trustees are provided for in the Trust Agreement.  This case involves the interpretation and construction of those provisions relating to the responsibilities of the Trustees in terminating and distributing the assets of the Meyer Trust.  Specifically, Article VII of the Trust Agreement provides that the Trust "shall be entirely distributed and the Trust terminated not later than [December 23, 1996], and if at said time any property shall then remain in the hands of the Trustees, the same shall be distributed for such purposes as mentioned in Article V hereof."

Article V of the Trust Agreement provides as follows:

"Subject to the terms of any specific gift, devise or bequest, the Trustees shall pay and disburse the net income and such portions of the principal of the Trust Estate as may, from time to time, be available for distribution at such times and in such amounts as the Trustees in their absolute discretion shall direct for such religious, charitable, scientific, literary or educational purposes as, in the opinion of the Trustees, will be for the best interests of the Trust and the beneficiaries thereof.  Such disbursements may be made directly for the relief of the poor, for the care of children, the sick, the aged and the helpless and for the promotion of ascience [
sic
], art, education, religion and health without regard to race, sex, color, or creed; or indirectly by gifts to or grants in aid of corporations, trusts, community chests, funds, or foundations created or organized in the United States or in any possession thereof or under the laws of the United States or of any State or territory or any possession of the United States organized and operated exclusively for carrying on religious, charitable, scientific, literary or educational activities, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no part of whose activities is the carrying on of propaganda, or otherwise attempting, to influence legislation.

In no event and under no circumstances shall any part of the Trust Estate, whether principal, income or accumulations, be distributed to or inured [
sic
] to the benefit of

1. The Grantor, his heirs or personal representatives;

Any of the Trustees or their successors in trust;

Any corporation, association or trust unless it be organized and operated exclusively for religious, charitable, scientific, literary and educational purposes or for one or more of such purposes, and unless no part of the net earnings thereof inures to the benefit of any shareholder, member, director, trustee, officer or other person engaged in management of its affairs."

The Grantor also limited the Trustees' liability in handling the affairs of the Trust.  In Article IX of the Agreement, the Grantor provided that "the Trustees shall be responsible only for their own willful and corrupt breach of trust and not one for another."  In addition, Article XI states in pertinent part that the Trustees "shall not be liable for any mistake in judgment or decrease in value of the Trust Estate, or for any acts or omissions done or permitted to be done by them in good faith."

At the time the trust was to terminate on December 23, 1996, the Trustees were unaware of the termination provision in the Trust Agreement and continued to serve in their capacities as Trustees of the Meyer Family Foundation.  They first became aware of the termination provision in 1999.  At that time, the Trustees had determined that the asset value of the Foundation had reached a point where it would be prudent to amend the Trust Agreement to increase the size of the board of trustees.  After reviewing the Trust Agreement to determine how to add additional trustees, legal counsel discovered and advised the Trustees that they were to have terminated the Trust and distributed the 
corpus
 in December 1996.  

Charles Brown testified that shortly after discovering the termination provision, the Trustees, along with Louis Brown and Howard Jessen, created the Oakleaf Foundation in June 1999, to receive the assets of the Meyer Family Foundation.  They also contacted the Attorney General regarding their proposed termination and distribution to the Oakleaf Foundation.  The Oakleaf Foundation is an Illinois not-for-profit corporation, and a private foundation within the meaning of section 509(a) of the Revenue Code (IRC §509(a)(2003)).  It is a tax-exempt charitable organization as described in section 501(c)(3) of the Revenue Code (IRC §501(c)(3)(2003)).  In addition to the Trustees, Louis Brown and Howard Jessen also agreed to serve as directors of the newly established Oakleaf Foundation.  The Foundation will operate exclusively to carry on religious, charitable, scientific, literary or educational activities and has no termination date. 

    Ultimately, the Trustees filed the instant declaratory judgment action, seeking court approval to distribute the 
corpus
 of the Meyer Family Foundation to the Oakleaf Foundation.  The Attorney General filed a counterclaim seeking to terminate the trust relationship with the Trustees and distribute the assets directly to "end-user" charities.  The Attorney General alleged that the Trustees breached their fiduciary duties to the Meyer Family Foundation by failing to adhere to the terms of the Trust Agreement and by seeking to retain control of the trust 
corpus
 through distribution to the Oakleaf Foundation.  He further alleged that the Trustees had engaged in self-dealing at the expense of the Meyer Family Foundation and came to court with unclean hands.  The circuit court denied cross-motions for summary judgment, finding that there were genuine issues of material fact remaining regarding a breach of fiduciary duty and self-dealing.  

After a one-day bench trial, the circuit court found that there was no evidence that the Trustees acted other than in a manner that the Grantor desired them to act, and that considering all of the facts and circumstances, the Trustees acted with "deliberacy" in winding up the affairs of the Trust.  The trial court further found that from a complete and total reading of the Trust Agreement it was clear that the Grantor intended that distributions could be made to a foundation whose fiduciaries included the Trustees of the Meyer Family Foundation.  Accordingly, the circuit court (1) granted the Trustees' petition to distribute the 
corpus
 of the Meyer Family Foundation to the Oakleaf Foundation, and (2) denied the counterpetition of the Attorney General to terminate the trust and distribute its assets directly to "end-user" charities.

ANALYSIS

The Attorney General's primary contention is that the circuit court erred in ruling that the Trustees could distribute the 
corpus
 of the trust to another foundation that is managed and operated by some of the same fiduciaries.  It argues that such a distribution would be a prohibited, self-interested, transfer to the Trustees themselves in direct contravention of the plain language of the Trust Agreement.  It maintains that it was the intent of the Grantor that the trust relationship between the Trustees and the 
corpus
 should end after December 23, 1996, and the 
corpus
 be distributed to new and different trustees.  Thus, we are asked to construe and interpret the provisions of the Trust Agreement relating to the distribution of assets upon the termination of the Trust. 

At the outset, we must determine what law controls the construction of the trust instrument.  As provided in section 268 of the Restatement (Second) of Conflicts of Laws:

"(1) A will or other instrument creating a trust of interests in movables is construed in accordance with the rules of construction of the state designated for this purpose in the instrument.

(2) In the absence of such a designation, the instrument is construed

(a) as to matters pertaining to administration, in accordance with the rules of construction of the state whose local law governs the administration of the trust, and

(b) as to matters not pertaining to administration, in accordance with the rules of construction of the state which the testator or settlor would probably have desired to be applicable." Restatement (Second) of Conflicts §268 (1971).

Here, the Grantor did not expressly designate that the Trust Agreement be subject to and construed according to the laws of Nebraska.  Accordingly, as to matters of trust administration, we apply the law of the forum state of Illinois because the trust was subject to administration here under the Charitable Trust Act (760 ILCS 55/1 
et
 
seq.
 (West 2000)).   As to matters of trust construction, we note that the document was executed in Nebraska,  the Grantor references the courts of Nebraska in provisions regarding the appointment and removal of trustees, and states that after his death, "it shall be the duty of the Trustees to notify the District Court for Douglas County, Nebraska, of the existence of this Trust."  To the extent that Nebraska law may apply to the construction of the trust, we find that it does not conflict with Illinois law and therefore apply the law of the forum state to the construction of the trust.  Compare
  
Wahrman v. Wahrman
, 243 Neb. 673, 674, 502 N.W.2d 95, 97 (1993); and 
Smith v. Smith
, 246 Neb. 193, 195, 517 N.W.2d 394, 397 (1994), with 
Eychaner v. Gross
, 202 Ill. 2d 228, 779 N.E.2d 1115, 1133 (2002); 
Harris Trust & Savings Bank v. Donovan
, 145 Ill. 2d 166, 172, 582 N.E.2d 120, 123 (1991).    

A court's primary concern in construing a trust instrument is to discover the intent of the grantor. 
 
Donovan
, 145 Ill. 2d at 172, 582 N.E.2d at 123.  In determining that intent the court must first consider the plain and ordinary meaning of the words used and must consider the entire document.  
Eychaner
, 202 Ill. 2d at 256, 779 N.E.2d at 1133.  Where the trust contains language that is unambiguous and clear, the intent must be ascertained from that language; extrinsic evidence may be admitted to aid the interpretation only if the document is ambiguous.  
Stein v. Scott
, 252 Ill. App. 3d 611, 615, 625 N.E.2d 713, 716 (1993). We review the trial court's construction of the trust instrument 
de novo
. 
Stein
, 252 Ill. App. 3d at 615, 625 N.E.2d at 716
.  

The Attorney General directs our attention to that portion of Article V, paragraph two, of the Trust Agreement which provides that "[i]n no event and under no circumstances shall any part of the Trust Estate, whether principal, income or accumulations be distributed to or inured [
sic
] to the benefit of * * * [a]ny of the Trustees or their successors in trust."  He argues that a distribution of the 
corpus
 of the Meyer Trust to the Oakleaf Foundation is merely a distribution of the assets to the Trustees in violation of paragraph two.  However, here, the Trustees seek to distribute the assets to a corporation.  It is well settled that a distribution of assets to a corporation cannot be construed as a distribution of assets to its directors.  
In re Rehabilitation of Centaur Insurance Co.
, 158 Ill. 2d 166, 172, 632 N.E.2d 1015 ("A corporation is a legal entity separate and distinct from its shareholders, directors, and officers"). 

Furthermore, the plain language of the Trust Agreement evidences that the Grantor intended to preclude distributions to the Trustees in their individual capacities and to preclude, as provided for in paragraph three, distributions to certain corporations.  Paragraph three of the Trust Agreement specifically provides that principle, income and accumulations may not be distributed to a corporation unless (1) it is "organized and operated exclusively for religious, charitable, scientific, literary and educational purposes or for one or more of such purposes," and (2) "no part of the net earnings thereof inures to the benefit of any shareholder, member, director, trustee, officer or other person engaged in the management of its affairs."  

 Here, pursuant to the circuit court order, the Oakleaf Foundation is organized and will operate exclusively for religious, charitable, scientific, literary and educational purposes.  Additionally, there was no evidence presented that the Oakleaf Foundation directors will benefit from the income, principle or accumulations of the Meyer Trust.  Article V of the articles of incorporation of the Oakleaf Foundation specifically provides that "[n]o part of the net earnings of the corporation shall inure to the benefit of, or be distributable to, its members, directors, officers or other private persons."  Additionally, section 11 of Article VI of the bylaws of the Oakleaf Foundation was amended prior to trial to provide that "[n]o director shall receive compensation for services to the corporation as a director, officer or otherwise."  Lastly, the Revenue Code expressly prohibits trustees of charitable organizations from self-dealing (IRC § 4941(d)(2003)), and no evidence was presented at the trial to suggest that the principal, income, or accumulations would be distributed or would inure to the benefit of the Trustees in their individual capacities.

Had the Grantor sought to limit the Trustees from continuing to manage the assets of the Meyer Trust, he could have expressly provided that upon distribution, the Trustees shall no longer have the authority to manage or control the assets of the trust.  Rather, the Grantor specifically provided in Article V that the 
corpus
 shall be distributed "as the Trustees 
in their absolute discretion
 shall direct for such [charitable] purposes 
as in the opinion of the Trustees
, will be in the best interests of the Trust and beneficiaries thereof." (Emphasis added.) 

Lastly, we note that during the bench trial, counsel for the Attorney General conceded that had the Trustees distributed the 
corpus
 of the Trust to another foundation and the foundation asked the Trustees to become board members of that foundation, such a distribution would be acceptable.  We see no difference between such a hypothetical and the scenario that exists in the present case.  Accordingly, we find that the Trust Agreement does not prohibit a distribution to a foundation where some of the directors of that foundation previously served as trustees of the Meyer Family Foundation.

We further reject the Attorney General's argument that the Oakleaf Foundation is not a proper distributee upon termination of the Meyer Family Foundation because it is merely a grant-making entity rather than an "end-user" charity.  Article V of the Trust Agreement specifically provides that the Trustees are to distribute the assets of the Trust "
directly
 for the relief of the poor * * * 
or
 
indirectly
 by gifts to or grants in aid of corporations, trusts, community chests, funds or foundations."  (Emphasis added.)  Thus, the Trust Agreement expressly provides for a distribution to charities other than end-user charities and specifically includes foundations in its purview.        

The Attorney General additionally argues that a distribution to the Oakleaf Foundation will improperly allow the Trustees to evade the limitation placed on the duration of the Trust and to entrench themselves as trustees of the Meyer Trust assets for an indefinite period of time, perhaps in perpetuity.  The Attorney General does not direct this court to any language of the Trust Agreement that would indicate that the purpose of the 50-year termination clause was to end the relationship between the Trust 
corpus
 and the Trustees.  Rather, Articles VII and V of the Trust Agreement taken together expressly provide that the Trust shall terminate after 50 years, 
and
 "if at such time any property shall remain in the hands of the Trustees, the same shall be distributed for such purposes as mentioned in Article V hereof."  Article V provides that the assets shall be distributed for "such religious, charitable, scientific, literary or educational purposes as,
 in the opinion of the Trustees
, will be for the best interests of the Trust and beneficiaries thereof."  (Emphasis added.)  Thus, the Grantor specifically contemplated that property may remain in the hands of the Trustees after the 50 years and left it to the absolute discretion of the Trustees to distribute the property for such charitable purposes that the Trustees believed would be in the best interest of the trust and the beneficiaries.  

 That the newly created foundation may continue in perpetuity does not violate the terms of the Trust Agreement, nor does it invalidate it as a charitable trust.  A charitable trust is "valid even though it continues indefinitely".  4A A. Scott & W. Fratcher, Trusts §365, at 109 (4th
 ed. 
1989).  The Attorney General makes the conclusory argument that by allowing the fiduciaries to continue to manage the assets of the trust, there would be no way for a grantor to effectively control the duration of his or her trust.  On the contrary, the actions of trustees must be governed by the terms of the trust instrument before them.  Had the Grantor sought to limit the duration of the  corporation to which the assets would be distributed, the Grantor could have done so.  Here, there is nothing in the Trust Agreement to suggest that when assets of the trust remain after 50 years, and are then distributed for a charitable purpose as directed, the 
corpus
 must be distributed to a charity with a fixed termination date. 

We next address the Attorney General's contention that as beneficiary of the Trust, the State of Illinois is entitled to compel the court to terminate the trust and end the relationship between the Trustees and the Trust 
corpus
.  It is true that the Attorney General acts as the beneficiary of the Trust.  In the case of a charitable trust, the beneficial interest is not given to individual beneficiaries, but instead for purposes beneficial to the community.  4A A. Scott & W. Fratcher, Trusts §391, at 357 (4th
 ed. 1989).  Thus, the community has an interest in enforcing the trust and the Attorney General represents the community in seeing that the trust is properly construed and that the funds are applied to their intended charitable uses.  760 ILCS 55/1 
et
 
seq.
 (West 2000); 
In re Estate of Tomlinson
, 65 Ill. 2d 382, 387, 359 N.E.2d 109, 111 (1976); 
In re Estate of Stern
, 240 Ill. App. 3d 834, 836-37, 608 N.E.2d 534, 536 (1992); 4A A. Scott & W. Fratcher, Trusts §391, at 357 (4th
 ed. 1989).  Generally, the Attorney General has the right to be heard in a proceeding to terminate a charitable trust.  However, the Attorney General's consent or nonconsent, while heavily weighed, is not necessarily determinative or binding upon the court.  See 4A A. Scott & W. Fratcher, Trusts §391, at 361 (4th ed. 1989).  

The Attorney General relies upon the Restatement (Second) of Trusts §337 (1959), for the proposition that it can direct the court to terminate the trust, end the trust relationship between the Trust 
corpus
 and the Trustees, and distribute the trust directly to "end-user" charities.  Section 337 provides that if all of the beneficiaries of a trust consent, and none is under an incapacity, they can compel the termination of the trust 
before its stated duration has expired
 if the continuance of the trust is not necessary to carry out a material purpose of the trust.  Restatement (Second)
 of Trusts §337, Comment 
a
 (1959).  

Here, section 337 is inapplicable where the Grantor explicitly provided for the trust to terminate at a specific time and that time has already arrived.  Thus, the role of the Attorney General is to either consent or not consent to the distribution of the assets and to enforce the intent of the Grantor as specifically provided for in the Trust Agreement
.  This is not a case where the trust is not yet ripe for termination or where the trustees have refused to terminate the Trust.
  As stated above, nothing in the Trust Agreement precludes the Trustees from terminating the Meyer Family Foundation and distributing the 
corpus
 to the Oakleaf Foundation.  Accordingly, the trial court did not err in denying the request of the Attorney General and enforcing the Trust Agreement as provided.

We next address the Attorney General's argument that the distribution to the Oakleaf Foundation is wasteful of charitable assets.  Specifically, he argues that the Oakleaf Foundation will incur an intermediate layer of administrative expenses and potential tax liability, which a non-foundation recipient charity would not incur.  Pursuant to section 15(a) of the Charitable Trust Act, trustees are subject to certain duties to avoid wasting charitable assets and avoid incurring unnecessary taxes. 760 ILCS 55/15(a)(2), (a)(3)(West 2000).  Again, we note that the Trust Agreement specifically contemplated that the trust 
corpus
 would be distributed to a foundation or corporation which would inevitably incur administrative costs.  The facts presented at the bench trial reveal that the Meyer Family Foundation has incurred annual administrative expenses of about $75,000, and that those costs would continue to remain the same under the Oakleaf Foundation.  The principal expense has been investment advisor fees.  

No evidence was presented to suggest that such an amount was exorbitant or not in keeping with other similarly situated foundations.  Nor was there evidence presented that such costs were wasteful in light of the evidence that the asset value of the Foundation increased to $11.4 million.  While there is always a potential for excise tax liability should any foundation fail to distribute at least 5% of its net investment assets in any given year (26 U.S. C.  §4946, §4942 (2000)) such argument is merely speculative, and no evidence was presented that the Trustees had failed to meet that requirement in the past.

Lastly, the Attorney General contends that the Trustees cannot be awarded the relief they seek because they came to court with unclean hands.  The "clean hands" doctrine prohibits '"one seeking equity [from] tak[ing] advantage of his own wrong."'  
La Salle National Bank v. 53rd-Ellis Currency Exchange, Inc.
, 249 Ill. App. 3d 415, 437, 618 N.E.2d 1103, 1119 (1993), quoting 
Jaffe Commercial Finance Co. v. Harris
, 119 Ill. App. 3d 136, 140, 456 N.E.2d 224, 228 (1983).   The party making the contention must prove that the other party is, in fact, guilty of fraud or bad faith toward those making the contention.  
Hasselbring v. Lizzio
, 332 Ill. App. 3d 700, 707, 773 N.E.2d 770, 775 (2002).  It is within the sound discretion of the trial court whether to apply the doctrine, and its application has not been favored by the court.  
La Salle National Bank
, 249 Ill. App. 3d at 437-38, 618 N.E.2d at 1119.

The Attorney General argues that the Trustees are guilty of bad faith and fraud because they breached their fiduciary duty to the trust by failing to terminate it and timely distribute its 
corpus
 by December 23, 1996, as expressly provided for under the terms of the Trust Agreement.  The Restatement of Trusts §334, Comment 
a
 (1935), as adopted by our supreme court in 
Breen v. Breen
, 411 Ill. 206, 103 N.E.2d 625 (1952), and as stated more recently in the Restatement (Second) of Trusts §334 (1959), provides as follows:

"Where by the trust instrument it is provided that the trust is to terminate on the expiration of a certain period, the trust will not terminate on the expiration of the period if at that time the purposes of the trust have not been accomplished, and if the settlor manifested an intention that the trust should continue until the accomplishment of the purposes of the trust.  In such a case the provision that the trust is to terminate on the expiration of the period is construed as being merely directory."  Restatement (Second) of Trusts §334, Comment 
a
 (1959).

Thus, under Illinois law, a trust continues beyond termination until it is finally wound up.  The period for winding up depends upon the facts and circumstances of each particular case.  
Breen v. Breen
, 411 Ill. 206, 103 N.E.2d 625 (1952),  Scott on Trusts further states in pertinent part:

"When the time for the termination of the trust has arrived, it is the duty of the trustee to wind up the trust and make distribution of the trust property as soon as he reasonably can do so.  Whether the trustee has been guilty of an improper delay in winding up the trust depends upon all the circumstances."  4 A. Scott & W. Fratcher, Trusts §345.1, at 551 (4th ed. 1989).

With these principles in mind, we turn to the facts of the present case.  Here, there is no question that the Trustees failed to begin winding up the Trust until 1999, three years after the trust was to have terminated.  However, there is no evidence that their delay in winding up was unreasonable or that it was done in bad faith or ultimately that there was any liability for the delay.  The circuit court found that as soon as the termination date came to their attention, they acted promptly to wind up the affairs of the trust by contacting the Attorney General and filing the present declaratory judgment action.  It was a large trust with fairly significant financial considerations.   This was not a situation where the property at issue depreciated in value; rather, the evidence revealed that it increased in value during that interim period.  Thus, the circuit court's determination that the Trustees did not breach their fiduciary duty was not against the manifest weight of the evidence.

We additionally reject the Attorney General's argument that the Trustees' hands are unclean because their actions are tainted by self-interest.  While he argues that at the time their petition was presented to the court, the Trustees as board members of the Oakleaf Foundation were entitled to receive compensation under the bylaws of the foundation, there is no proof of self-dealing.  Charles Brown testified that they have not received any compensation for their role as Trustees.  Prior to trial, upon discovering what he described as an inadvertent provision, they sought to amend the bylaws to disallow any compensation.  

The Attorney General additionally intimates that there is an indirect benefit to the Trustees through their power and standing with respect to the various prospective "end-user" charities which would be forced to compete for their favor.  No such argument was made before the circuit court and no evidence was presented at trial to support such an argument.  There is simply no proof of self-dealing on the part of the Trustees.  Accordingly, the circuit court did not abuse its discretion in finding that the Attorney General failed to establish the fraud or bad faith necessary to constitute unclean hands.

Accordingly, for all of the foregoing reasons, the judgment of the circuit court is affirmed.

Affirmed.        

KARNEZIS, J., concurs.

JUSTICE GREIMAN, specially concurring in part and dissenting in part:

I agree with the majority that there is no showing of "unclean" hands on the part of the Trustees. On the one issue that might have suggested "unclean hands," they amended the bylaws of the Oakleaf Foundation to exclude any possibility of any direct salary or compensation to the several Trustees, now officers or directors of the Oakleaf Foundation.

I disagree with the majority on the issue of the construction of the language of the trust with reference to the impact and effect of the settlor's direction to terminate the trust after 50 years.

The trust was executed in Omaha, Nebraska, and it provides for application by the Nebraska Attorney General to the District Court of Douglas County, Nebraska, in the event no successor trustee is appointed, requires the Trustees to notify the District Court for Douglas County, Nebraska, of the existence of the trust after the death of the settlor, and further provides that after the death of the settlor, the Trustees' books, records and accounts are subject to inspection by the District Court of Douglas County, Nebraska.

The majority, although quoting the Restatement of Conflicts of Laws, appears to ignore the rather plain language of the Restatement. There are at least four references to the State of Nebraska in the instrument and direct references to the role of the District Court of Douglas County, Nebraska. The document does not suggest that the Trustees go to "court" or that the moving party be "an Attorney General." It is the District Court of Douglas County, Nebraska, that is directed to get involved with administration of the trust, and it is the Nebraska Attorney General that is directed to go into the District Court of Douglas County, Nebraska. 

The Restatement suggests that the trust be construed in accordance with the laws of the state designated for this purpose in the instrument. Surely these references to Nebraska in the trust should satisfy this prong of the Restatement. More compelling is the provision of the Restatement that directs the court to use "the rules of construction of the state which the testator or settlor would probably have desired to be applicable."   Restatement (Second) of Conflicts of Laws § 268, at 144 (1971).

Certainly at least five references to the State of Nebraska, its District Court or its Attorney General should probably give us some idea which state's laws should be employed in the construction of this document.

Article VII of the trust agreement provides:

"The Trust Estate shall be entirely distributed and the Trust terminated not later than fifty years (50) from the date of this Agreement, and if at such time any property shall remain in the hands of the Trustees, the same shall be distributed for such purposes as mentioned in Article V hereof.  If, prior to the termination date, the Trustees shall have distributed the entire Trust Estate, the Trust shall thereupon end, and the Trustees shall stand discharged."

In 
Olson v. Sampson
, 208 Neb. 18, 302 N.W.2d 32 (1981), the Nebraska Supreme Court examined the intent of the settlor and determined that a gift of the right to use the family house as long as any of his children were alive did not include a restriction on the use and sale of a huge parcel of adjoining land. In 
Olson
, the court observed:

"In searching for the intention of the testator, the court must examine the entire will, consider each of its provisions, give words their generally accepted literal and grammatical meaning, and indulge the presumption that the testator understood the meaning of the words used. 
Where a possible construction of the words in a will leads to a highly improbable result, the court will lean toward a construction that will carry out the natural intention of the testator
."
  
(Emphasis added.)  
Olson
, 208 Neb. at 21, 302 N.W. 2d at 34.

The majority is correct that Article V, which deals with the administration of the trust, grants "absolute discretion" to the Trustees to disburse the income and principal of the trust to a variety of charitable causes, including "foundations*** organized and operated exclusively for carrying on religious, charitable, scientific, literary or educational activities."

In Article VII, where the settlor directed termination of the trust after 50 years, he referred to the administrative provisions of the trust, Article V.

Could he have imagined that to comply with the direction to terminate the trust after 50 years, the Trustees would establish a foundation and pour over the $11 million?  In establishing the trust, the settlor provided that distributions be for "religious, charitable, scientific, literary or educational purposes."  The charter of the Oakleaf Foundation filed with the Illinois Secretary of State, in addition to those beneficiaries cited in the trust, adds "national or international amateur sports competition."  Amateur sports competition?  Amateur sports competition!  Fortunately, the trial court directed this new beneficiary be removed by the board of directors and this was done.  Inserting the new beneficiary in the Oakleaf charter does, however, indicate how far we have come from Mr. Meyers' state of mind on that day in 1946 when the trust was created.

We should question whether the Trustees have complied with the terms of the trust in its termination and liquidation where, contrary to the express language of the instrument, the new arrangement provided compensation for the fund managers and changed the stated beneficiaries.  It was only after court proceedings were commenced that there was compliance with the terms of the trust.

Returning to 
Olson
, where the construction "leads to a highly improbable result," we should lean to a construction that will carry out the natural intention of the settlor. I would give effect to the clear intention expressed in Article VII, the termination of the trust. The majority allows the language-albeit clear-of Article V to trump the required termination of the trust.

I do not give much credence to the Attorney General's argument that continuing the foundation causes an unnecessary expense in the administration of the funds. However, I do believe that continuing the administration of the funds in the guise of a foundation deprives the poor and the needy of the 
corpus
 of the trust: $11 million. The majority sets out the requirements of the Internal Revenue Code, which imposes upon charitable foundations the obligation to annually distribute 5% of their net investment assets. Accordingly, the Oakleaf Foundation need only distribute about $550,000 a year rather than distribute the entire $11 million to the "end user" charities. If that was the desire of the settlor, why the 50-year termination? Why not the trust in perpetuity? 

I believe that a fair reading of this document is that the settlor wished to end this wonderful undertaking 50 years after he executed the document.
(footnote: 1)  Apparently, contrary to his expressed intentions, the majority believes that he wished it to go on in perpetuity.

FOOTNOTES
1:
Apparently the notion that charitable trusts and foundations are given a date certain for termination is neither new or unique.  Julius Rosenwald, one of Illinois's most generous philanthropists, required that his charitable foundation use both income and principal within 25 years of his death.  In a 1929 article in the Saturday Evening Post, 
The Burden of Wealth
, he reasoned "'I am opposed' *** 'to the principle of storing up large sums of money for philanthropic uses centuries hence, for two reasons: First, it directly implies a certain lack of confidence with regard to the future, which I do not share....Second, I am against any program that would inject the great fortunes of today into the affairs of the nation five hundred or a thousand years hence.'"  He also noted that he believed "'the generation which has contributed to the making of a millionaire should also be the one to profit by his generosity.'"  Diane Granat, 
Give till It's Gone
, Chicago, May 2003, at 109, quoting Julius Rosenwald, 
The Burden of Wealth, 
Saturday Evening Post, 1929.