# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 04-2277

ILLINOIS CLEAN ENERGY COMMUNITY FOUNDATION,

*Plaintiff-Appellee,*

v.

JOHN B. FILAN, Director, Illinois Governor's
Office of Management and Budget,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 7596—**Amy J. St. Eve**, *Judge.*

_____

ARGUED OCTOBER 25, 2004—DECIDED DECEMBER 22, 2004

_____

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges.*

POSNER, *Circuit Judge.* This is a suit to enjoin the State of Illinois from enforcing a demand that the plaintiff foundation turn over $125 million of its assets to the state. This is not a tax, but a taking. *Brown v. Legal Foundation of Washington*, 538 U.S. 216, 233-35 (2003). The district court

granted summary judgment for the plaintiff, ruling that the demand if enforced would be a taking of private property for public use without just compensation, and therefore unconstitutional; and the state appeals.

In 1999, the Illinois Commerce Commission authorized Commonwealth Edison to sell its seven fossil-fuel power plants for $4.8 billion. The sale turned a "huge" profit according to *Generation Week,* Dec. 22, 1999; see also Peter Kendall, "Push Grows to Alter ComEd Deal," *Chicago Tribune*, Mar. 30, 1999, p. DN 6. The state argues, and for purposes of this appeal we accept, that the commission, whose permission was required for the sale, 220 ILCS 5/7-102(c), could have conditioned permission on ComEd's agreeing to pass on most or perhaps all of the profit to the company's ratepayers in the form of rate reductions; but that instead, by way of generous "compromise," the state legislature "authorized" (realistically meaning—the state contends and ComEd hardly bothers to deny—"commanded") the company to establish the plaintiff foundation and fund it with $225 million of the proceeds from the sale of the plants. 220 ILCS 5/16-111.1. The authorizing statute provided that the amount would be $250 million unless ComEd contributed $25 million to Southern Illinois University for projects relating to clean coal, but it did so and therefore had to contribute only $225 million to the foundation.

The foundation's mission, as prescribed by the statute, is to make grants to public and private institutions in Illinois for projects to conserve energy and improve the environment. The statute authorizes the foundation's trustees to decide what grants to make within these broad limits of subject matter, except that $25 million of ComEd's contribution must be kept available for the funding of projects relating to clean coal (this is separate from the $25 million mandated contribution to Southern Illinois University) and that up to $1

million a year for seven years must to be given to the Citizens Utility Board. The foundation has complied with these conditions.

The foundation was organized under the state's charitable-foundation statute, 805 ILCS 105/101.01 *et seq.*, and none of its employees are public employees. Nor are grants made by the foundation subject to the state's rules govrning the expenditure of public funds. The authorizing statute requires that there be six voting trustees, each appointed for a five-year term. One is to be appointed by ComEd, one by the Governor of Illinois, another by the Speaker of the Illinois House of Representatives, another by the President of the Illinois Senate, and the remaining two by the minority leaders of the two houses. The statute contains no provision for the removal of trustees against their will (if they quit, their successors are appointed in the same manner as they were), but the foundation has adopted a bylaw authorizing the officials who appoint trustees to remove them.

In June 2003, the Illinois legislature amended the authorizing statute to require the trustees, upon written demand by the state's budget director (the defendant, sued in his official capacity), to turn over to the state's treasury and state environmental agencies up to $125 million, which is to be used for funding the agencies and repaying state general obligation bonds. A demand for the entire $125 million ($9 million for bond repayment, the rest for the agencies) was made the next month, and this suit followed.

The state argues that the foundation *is* the state and therefore cannot sue the state and, even if it could, may not complain about a taking of its property because its property is the state's property. The state relies on the background of the statute authorizing the creation of the foundation, a background which suggests that ComEd would not have been allowed to keep the $250 million of the proceeds from

its sale of the power plants had it not agreed to establish and fund the foundation. The state also relies on the restrictions that the statute places on grants by the foundation and on the fact that five of the six trustees are appointed by state officials. And it argues that a state has a right to amend its statutes.

The last argument is quickly disposed of as a basis for the state's action. Of course a state can amend its statutes; and it can also, whether by amendment or otherwise, regulate private entities extensively before it goes so far as to be deemed to have made a regulatory taking, that is, a taking that, unlike the one here, does not transfer title to property from the owner to the state but achieves the same end by unreasonably restricting the use of the property, causing its value to plummet, perhaps to zero. See *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992); *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978); *Raceway Park, Inc. v. Ohio*, 356 F.3d 677, 684-87 (6th Cir. 2004); cf. *Pittman v. Chicago Board of Education,* 64 F.3d 1098, 1104-05 (7th Cir. 1995). But obviously the state cannot lawfully enlarge its regulatory power by deciding to take someone's property by the device of amending an existing statute rather than enacting a new one. *Lucas v. South Carolina Coastal Council, supra*, 505 U.S. at 1027-28; *Bowen v. Public Agencies Opposed To Social Security Entrapment*, 477 U.S. 41, 54-55 (1986); *Great Lakes Higher Education Corp. v. Cavazos*, 911 F.2d 10, 17 (7th Cir. 1990); *Cienega Gardens v. United States*, 331 F.3d 1319, 1323-24 (Fed. Cir. 2003). It cannot lawfully amend its corporation law to confiscate the assets of all corporations incorporated, or licensed to do business, in Illinois by virtue of that law. The fact that the state legislature authorized the creation of the plaintiff foundation does not make the foundation a state agency; for the legislature also authorizes the creation of business and

professional corporations, not to mention religious and charitable corporations, without thereby acquiring a right to confiscate such entities' assets. *Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 638-40 (1819); *Northrip v. Federal National Mortgage Ass'n*, 527 F.2d 23, 30-31 (6th Cir. 1975).

What is true is that claims of unconstitutional taking are matters of expectation, and so a grant that is expressly provisional would not create a property right and alternatively the acceptance of the grant by the grantee would be treated as a waiver of any complaint should the grant later be rescinded in accordance with its terms. This suit would go nowhere had the statute creating the plaintiff foundation reserved the right of the state to confiscate the foundation's assets. *Bowen v. Agencies Opposed to Social Security Entrapment, supra*, 477 U.S. at 51-52; *Dayton-Goose Creek Ry. v. United States*, 263 U.S. 456, 484 (1924); *Great Lakes Higher Education Corp. v. Cavazos, supra*, 911 F.2d at 15-17; *Texas Catastrophe Property Ins. Ass'n v. Morales*, 975 F.2d 1178, 1182 (5th Cir. 1992); *Education Assistance Corp. v. Cavazos*, 902 F.2d 617, 628-29 (8th Cir. 1990); cf. *Pittman v. Chicago Board of Education, supra*, 64 F.3d at 1103-04. There is no such reservation.

The coercive element in the history of the authorizing statute is irrelevant. Suppose the state didn't think that lawyers should be permitted to incorporate, and passed a law requiring that all professional corporations of lawyers be converted to partnerships. Would the partnership assets be public property? Obviously not. Supposing the state could indeed have forced ComEd to disgorge $125 million of its profits from the sale of the power plants, or indeed much more, to the ratepayers, could it then, years later, have ordered the ratepayers to contribute their rebates to the state treasury, on the ground that it was really the state's money? We cannot see what difference it makes that the disgorge-

ment was to a foundation rather than to individuals. By forcing a transfer of private property from one private entity to another, the state did not destroy the private character of the property. If the state orders a criminal to make restitution of a sum of money to the victim of his crime, it cannot snatch the money back from the victim on the ground that it's the state's money.

All the state is left to argue is that the appointment of five-sixths of the foundation's trustees by state officials made the foundation a state agency. Not so. By whomever appointed, the trustees of a charitable foundation have a fiduciary duty to conserve the foundation's assets. 760 ILCS 55/15(a)(2); see also *Schweickart v. Powers*, 613 N.E.2d 403, 410 (Ill. App. 1993); *In re Wabash Valley Power Ass'n, Inc.*, 72 F.3d 1305, 1319 (7th Cir. 1995); *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 324 and n. 1 (6th Cir. 1997); *Boston Children's Heart Foundation, Inc. v. Nadal-Ginard*, 73 F.3d 429, 433-34 (1st Cir. 1996); *Louisiana World Exposition v. Federal Ins. Co.*, 864 F.2d 1147, 1151-52 (5th Cir. 1989). That no doubt is why the trustees authorized this suit—biting the hand that appointed them, as it were. In any event there was more than one hand. Of the five trustees appointed by officials, no more than three can be from the same political party, since two of the five have to be legislative *minority* leaders. The sixth trustee is ComEd's nominee. Even if both houses of the legislature are controlled by the governor's party, and even if the governor has firm control over the leaders of the houses by virtue of being from the same party as they (which is by no means always the case), he controls at most half the trustees. It would be a fiction therefore to suggest that because public officials appoint most of the trustees, the state "controls" the foundation. If it really controlled it, we wouldn't have this lawsuit.

Because the removal power is also vested in the individual appointers rather than in the state, and because, in any event, the trustees, however threatened they are by removal, or however frequently replaced, owe by law their entire loyalty to the foundation and not to the officials who appointed them or to the state, the existence of that power (which anyway is created not by the statute but by a bylaw that the trustees could rescind at any time) does not make the foundation a public agency.

In fact the foundation differs little from one that an electrical utility might "voluntarily" establish in response to pressure from "greens," clean-fuel enthusiasts, and persons concerned with global warming. The property of such a foundation would certainly be private despite the foundation's being entangled with the state by virtue of the vesting in the state attorney general of responsibility for enforcing the terms of charitable trusts. *People ex rel. Smith v. Braucher*, 101 N.E. 944, 945-46 (Ill. 1913); *Brown v. Ryan*, 788 N.E.2d 1183, 1191-92 (Ill. App. 2003) .

The state falls back on *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), which held that Amtrak is subject to the First Amendment. Amtrak is a federally chartered, but formally private, corporation. It is a for-profit corporation (though it has never turned a profit) and therefore has common stock, which is privately owned; the federal government owns its preferred stock and the President of the United States appoints two-thirds of its trustees. The Supreme Court expressed concern that if Amtrak were held to be a private entity and therefore unregulated by the First Amendment the government could evade constitutional restraints by farming out federal government functions to federally chartered corporations. So for First Amendment and perhaps some other constitutional purposes Amtrak is public, but it does not follow that for takings purposes it is

public. Suppose Congress ordered Amtrak to turn over its entire assets to the U.S. Treasury. Those assets belong to Amtrak, which is to say to its common shareholders. The hypothetical law would be a confiscation of private property and so fall under the bar of the Fifth Amendment's just-compensation clause.

And remember *Marsh v. Alabama*, 326 U.S. 501 (1946), where the Supreme Court held that a company town was bound by the First Amendment? Would anyone have argued that the government could have confiscated the company's land and buildings without compensation? The Court thought unjustified "the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a State statute" authorizing private ownership of land. *Id.* at 509. That concern is not engaged by a case such as this. The foundation is not accused of stifling anyone's First Amendment, or other constitutional, rights.

We conclude that the State of Illinois would be violating the Constitution if it confiscated any part of the foundation's assets. The judgment in favor of the foundation is therefore

AFFIRMED.

A true Copy:

    Teste:

                                _____

                                *Clerk of the United States Court of*
                                *Appeals for the Seventh Circuit*