IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 15, 2008

Charles R. Fulbruge III
Clerk

No. 06-60803

MISSISSIPPI SURPLUS LINES ASSOCIATION

Plaintiff-Appellant

v.

STATE OF MISSISSIPPI and J.K. STRINGER, IN HIS OFFICIAL
CAPACITY AS STATE FISCAL OFFICER

Defendants-Appellees

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:04-CV-670LN

Before HIGGINBOTHAM, SMITH, and OWEN, Circuit Judges.

PER CURIAM:[*]

I

Mississippi Surplus Lines Association ("MSLA"), a private, non-profit corporation working at the behest of the Mississippi Insurance Commissioner, collected funds, as permitted by law, to cover operating costs incurred under its duties to the Commissioner. The funds collected exceeded its operating costs. The State later amended the code to declare the funds public. MSLA challenged

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

the State's action in district court.[1]  The district court granted summary judgment for the State.  MSLA timely appealed.

## II

The State of Mississippi admits and licenses some insurers to do business in Mississippi; others, "surplus line insurers," are not admitted but are allowed to operate once Mississippi's Insurance Commissioner deems them eligible under the relevant state insurance laws.  The Commissioner reviews applications of agents who wish to procure business for surplus line insurers, collects fees from these agents, and publishes a list of eligible surplus line insurers, among other duties.  By statute, Mississippi permits the Commissioner to delegate some of this work to a non-profit association, provided the Commissioner determines that the association meets certain standards.  The code establishing these standards, as originally enacted in 1997 and amended in 2002 and 2004, states,

> (1) The Commissioner of Insurance may establish a stamping procedure for all eligible nonadmitted/surplus lines insurance policies sold on risks subject to the payment of premium taxes to the State of Mississippi.
>
> (2) The Commissioner of Insurance may rely upon the advice and assistance of a duly constituted association of surplus lines agents in carrying out the purposes of this chapter, if the association files with the commissioner:
>
>> (a) A copy of the association's constitution and articles of agreement of association or the association's certificate of incorporation and bylaws and any rules and regulations governing the association's activities;
>>
>> (b) A list of the association's members; and

---

[1] The complaint challenged Section 15(9) of House Bill 834 and Section 7(3) of House Bill 1279, Laws of Mississippi, 2004.  House Bill 834 added paragraph (9) to § 83-21-21, and House Bill 1279 authorized the fund transfer.

(c) The name and address of a resident of this state upon whom notices or orders of the commissioner or process issued by the commissioner may be served.

(3) The Commissioner of Insurance may examine the association's records concerning the functions or duties performed on behalf of the commissioner by the association.

(4) The association shall provide a means for the examination of all surplus lines coverages written to determine whether such coverages comply with the law and such rules or regulations as may be issued by the Commissioner of Insurance.

(5) The Commissioner of Insurance may refuse to accept, or may suspend or revoke the acceptance of, an association for any of the following reasons:

(a) It reasonably appears that the association will not be able to carry out the purposes of this chapter;

(b) The association does not maintain and enforce rules and regulations which will ensure that members of the association and persons associated with those members will comply with this chapter, other applicable state law or rules or regulations promulgated under either;

(c) The rules or regulations of the association do not ensure a fair representation of its members in the selection of directors and in the administration of its affairs;

(d) The rules or regulations of the association do not provide for an equitable allocation of reasonable dues, fees and other charges among members;

(e) The rules or regulations of the association impose an undue burden on competition; or

(f) The association fails to meet other applicable requirements prescribed in this chapter.

(6) A surplus lines agent shall cooperate with the association and the Commissioner of Insurance in fulfilling the surplus lines agent's statutory responsibility under this chapter.

(7) Upon request from the association, the Commissioner of Insurance may approve the levy of an examination fee of not more than one percent (1%) of premiums charged under this chapter for the operation of the association to the extent that such operation relieves the commissioner of duties otherwise required of the Commissioner of Insurance under this chapter.

(8) The association may revoke the membership of, and the Commissioner of Insurance may revoke the license in this state of, any licensee who fails to pay the examination fee when due, if the examination fee has been approved by the Commissioner of Insurance.

(9) [Added by amendment in 2004]: The fees levied and collected by the association pursuant to this section have been and remain public funds and shall be subject to transfer to the Department of Insurance Special Fund by act of the Legislature; provided, however, that not more than Two Million Dollars ($ 2,000,000.00) shall be transferred.[2]

In 1997, the Commissioner asked private individuals to form an association. In response to this request, the Mississippi Surplus Lines Association organized as a non-profit. The Commissioner reviewed MSLA's Plan of Operation, approved the association to assist him in his duties, and in 1997 approved a 1% examination fee, or "stamping fee," on surplus line policy gross premiums to fund MSLA. The association began collecting examination fees and twice recommended a reduction of these fees, both of which the Insurance Commissioner approved, reducing the fee to 0.5% in 2000 and 0.25% in 2003. MSLA used the fees collected to pay for its operating expenses, as permitted by statute, and invested the surplus. MSLA collected approximately $5.2 million

---

[2] Miss. Code Ann. § 83-21-21 (2007). Amendments in 2002 deleted former section 1, thereby re-numbering each other section. The 2004 amendment added section 9.

in fees but spent approximately $1.6 million from 1997 through 2005, accumulating excess funds of more than $3.6 million.

In 2004, when the State's budget was tight, the Mississippi legislature amended the code to require a transfer of $2 million from MSLA to the Insurance Department's Fund, and then to the State's Budget Contingency Fund. MSLA challenged this action, refusing to transfer the funds and requesting declaratory and injunctive relief in district court. The court granted the State's cross-motion for summary judgment, determining that "the excess examination fees held by MSLA are not its private funds but rather are held on behalf of the State, and accordingly, may be claimed by the State without violence to any constitutionally protected interest of MSLA." MSLA appealed. Because the Mississippi legislature has not attempted to appropriate any of MSLA's interest from its investment of the surplus, the funds at issue are the $2 million in fee proceeds claimed by the State.

MSLA argued before the district court that the Mississippi legislation violates the Fifth and Fourteenth Amendments as uncompensated takings and as deprivations of private property without due process. On appeal, it urges that the district court erred in finding no constitutional violations and granting summary judgment for the State and alternatively, in holding that there were no genuine issues of material fact.

III

We address the takings issue first, reviewing de novo the district court's grant of summary of judgment for the State.[3] MSLA relies primarily on two cases, Texas Catastrophe Property Insurance Association v. Morales,[4] and the

---

[3] See, e.g., Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm'rs, 493 F.3d 570, 575 (5th Cir. 2007) (reviewing de novo a district court's grant of summary judgment on a takings claim).

[4] 975 F.2d 1178 (5th Cir. 1992).

Seventh Circuit's Illinois Clean Energy Community Foundation v. Filan.[5]   It argues that the district court erred in finding no taking, urging that the appropriate inquiry under Morales and Filan is "on the state's relationship to the organization at issue."  We agree that the private or public nature of the organization is a necessary step in an inquiry when an entity acting for a state initiates legal action against the state.  As we held in Morales, "the relevant inquiry . . . is one of identity: the material question is whether [the association] is a part of the state."[6]  Yet Morales was not a takings case.  In addressing whether MSLA is a private or public entity, we cannot avoid the crucial question of whether the funds at issue are private or public property; this is the very essence of the takings inquiry.

In Morales, the nature of the organization and its connection to the state were central to our inquiry because an insurance pool challenged a code provision that required the pool to use the Texas Attorney General as counsel. Although the right to counsel question forced a close look at whether the organization was part of the state and could be required to use state counsel, we also looked to the nature of the pool's funds, holding that because "the state holds, and exercises, the coercive power to force private insurers doing business in Texas to cover certain risks does not mean that the money coming out of the companies' bank accounts is state money."[7]  And in Filan, although Judge Posner focused on the private nature of the organization controlling the assets at issue, he also discussed the "private character of the property."[8] The Seventh

---

[5] 392 F.3d 934 (7th Cir. 2004).

[6] 975 F.2d at 1182.

[7] Id. at 1182-83.

[8] 392 F.3d at 937.

6

Circuit similarly held in Great Lakes Higher Education Corp. v. Cavazos,[9] analyzing the "purpose of the instrumentality" as well as the public or private nature of the property managed by the instrumentality.[10]  In sum, we must look both to the nature of the organization holding the funds and to the nature of the funds claimed by the State to determine whether the funds are private or public property.

Both MSLA and its funds exist at the whim of the Mississippi legislature and are public in nature.  In Filan, the Seventh Circuit held,

> [A] grant that is expressly provisional would not create a property right and alternatively the acceptance of the grant by the grantee would be treated as a waiver of any complaint should the grant later be rescinded in accordance with its terms.  This suit would go nowhere had the statute creating the plaintiff foundation reserved the right of the state to confiscate the foundation's assets.[11]

Mississippi reserved the Insurance Commissioner's power to suspend or revoke the association's relationship with the State, not just the funds for its operating costs: the legislature conditioned the association's receipt of fee-generated funds upon the association's use of those funds for operating costs alone, for so long as the Commissioner found that the association relieved him of his statutorily-defined duties.  The statute provides that the Commissioner "may rely upon the advice and assistance of a duly constituted association"[12] and that the Commissioner "may refuse to accept, or may suspend or revoke the acceptance of, an association"[13] for any of six reasons.  MSLA retains some private

---

[9] 911 F.2d 10 (7th Cir. 1990).

[10] Id. at 14-15.

[11] 392 F.3d at 937.

[12] Miss. Code Ann. § 83-21-21 (2) (2007) (emphasis added).

[13] Id. at § 83-21-21 (5).

characteristics, despite its statute-based existence. As MSLA argues, "the Attorney General has 'formally opined that MSLA is not subject to the public purchasing and contracting provisions' in the Mississippi code," MSLA is a private, non-profit entity, MSLA hires its own employees, and MSLA must bear its own losses. Yet the fact that MSLA is not an official state agency does not show that it has overwhelmingly private characteristics. Even if MSLA were a wholly private entity, it could hold public funds to which it had no property right; conversely, a public entity could hold private funds. As the Seventh Circuit held in Great Lakes,

> The extensive federal regulation of the agency suggests its highly public nature. Although this characteristic does not absolutely preclude a successful constitutional challenge . . . it does suggest that any such attack requires a precise identification of the "private" property at issue.[14]

Despite MSLA's self-designation as a private entity, it exists wholly to serve the State and operates under conditions imposed by state law. We move now to the equally relevant question of the nature of the funds held by MSLA.

The State's legislation appropriating the funds is not a taking of private property because the funds, once they reached the association, were never private. Although Mississippi did not initially declare the funds as public property, MSLA received the funds solely because a state statute permitted the collection of a 1% fee to fund the operation of the State's surplus line insurance activities. Specifically, the code provides,

---

[14] 911 F.2d at 14-15. MSLA argues that the district court relied too heavily on Great Lakes and improperly rejected the reasoning of Morales and Filan. It points to the differences between this case and Great Lakes. But Filan and Morales also differ substantially from this case: Morales was not a takings case and Filan involved funds created by state legislation that directed a power company to make a single contribution to a fund "to make grants to public and private institutions," 392 F.3d at 935, not for the operating costs of an organization. The district court was not blind to these differences.

> Upon request from the association, the Commissioner of Insurance may approve the levy of an examination fee of not more than one percent (1%) of premiums charged under this chapter for the operation of the association to the extent that such operation relieves the commissioner of duties otherwise required of the Commissioner of Insurance under this chapter.[15]

Without this statute, the association could not have collected the Commissioner-approved fees. If the association had initiated its own fee system, not associated with its duties to the Commissioner or requiring the Commissioner's approval, then these would have been private funds. But with a state code as the source of the Commission's funds, the Commissioner could have at any time cut off the association's service, provided he relied upon one of the code's six reasons for suspension or revocation, and thus cut off the association's receipt of fees for its service. The fees were meant only to fund the operating costs expended by the association in fulfilling its duties to the Commissioner.

Great Lakes, although addressing different facts,[16] informed the district court's holding and is relevant to our inquiry. In Great Lakes, Congress created the Guaranteed Student Loan Program to "assist[] students in obtaining low-interest financing for post-secondary education."[17] All of the Program's assets went to a "reserve fund" to be used only for the loan program.[18] The

---

[15] Miss. Code Ann. § 83-21-21 (2007) (emphasis added).

[16] MSLA argues that Great Lakes is insufficiently similar to the present case, urging, "It is clear from a careful reading of Great Lakes that the existence of contracts and the detailed entity funding mechanisms to support the GSLP as specifically prescribed by federal law were significant to the Court's holding." It also urges that Great Lakes is a regulatory takings case because the funds at issue had not all been transferred to the Program's account before being claimed by Congress. We agree with the State that these differences do not diminish the relevance of the case to our analysis.

[17] 911 F.2d at 12.

[18] Id.

Program built up excess reserves, and Congress passed an Act to recover the excess and transfer it to a federal loan insurance fund.[19] The Seventh Circuit looked to the fact that the "guarantee agency itself is heavily regulated by federal law," that "[f]ederal law regulates the reserve fund extensively and it exists because of a federal mandate," and that Great Lakes' purpose was to "assist[] the United States in performing [the] function [of a loan guarantor]."[20] It concluded "that the reserve fund excess is not 'private property' for purposes of the Fifth Amendment."[21]

MSLA argues that our decision in Morales, holding that funds collected as a result of state coercion were private, requires us to hold that MSLA's funds are also private. In Morales, Texas required all Texas private property insurers to belong to a pool, which wrote "'windstorm, hail and fire insurance' in designated parts of the state,"[22] and paid claims. The pool funded its policies and claim payments using premiums, and if these did not cover its expenses, from "assessments against the member companies."[23] The money at issue in Morales, although "coercively" collected by the state by a statute requiring membership in a pool, had a private end use – insuring businesses against risk and paying those businesses' claims: "It was private money directed to pay private claims."[24]

The surplus line fees in Mississippi differ because they have a public end use. The fees are, as commanded by statute, to be used only to "relieve[] the

---

[19] Id. at 13.

[20] Id. at 14-15.

[21] Id. at 15.

[22] 975 F.2d at 1179.

[23] Id.

[24] Id. at 1183.

commissioner of duties otherwise required of the Commissioner of Insurance"[25] and only to pay for the association's operational costs. Their sole purpose is to support the Commissioner's work. They are not held for payment to private companies, unlike the funds in Morales. In Morales, "the State of Texas [was] not alone interested in the assets of [the pool]. . . . [and] the member companies [were] vitally interested in protecting their private monies."[26] The money at issue here funds a public function; once it leaves private hands, it funds the operating costs of an association working exclusively at the behest of the Commissioner and his needs.

## IV

Because Appellants did not have a property right in the $2 million in excess fees that the State appropriated, the legislature did not deprive them of a property right without due process of the law.[27] There are no Fourteenth Amendment violations, and the district court did not err in so holding and granting summary judgment for the State.

## V

Appellants alternatively argue that the district court should not have granted the State's motion for summary judgment because there were genuine issues of material fact barring a summary judgment decision. In determining whether there were genuine issues of material fact in the case below, "we review the evidence and inferences drawn from that evidence in the light most favorable to the non-moving party."[28] "A dispute about a material fact is genuine 'if the

---

[25] Miss. Code Ann. § 83-21-21 (7) (2007).

[26] 975 F.2d at 1183.

[27] See, e.g., Bd. of Supervisors v. Bailey, 236 So.2d 420, 423 (Miss. 1970) ("The appropriation of public funds is traditionally within the exclusive province of the legislature.").

[28] Wade v. Hewlett-Packard Dev. Co. LP Short Term, 493 F.3d 533, 537 (5th Cir. 2007) (citing Baker v. Metro. Life Ins., 364 F.3d 624, 627-28 (5th Cir. 2004)).

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[29]  Appellants have failed to identify any disputed and material facts. They broadly claim:

> [T]he filings of the parties on the motions for summary judgment revealed significant disputes as to certain facts.  This was mostly the Appellants' dispute with the Appellee's assertion of certain alleged facts and Appellee's characterization and suggested import of certain facts.

The key facts upon which the district court relied came from MSLA's organizational documents and the code granting the Commissioner power to assess fees and request the assistance of an association.[30]  MSLA has not pointed to any disputed fact that, if proven, would show that the legislation violated the Fifth or Fourteenth Amendment;[31] the district court did not err in finding no material facts in dispute.

AFFIRMED.

---

[29] Park v. Stockstill Boat Rentals, Inc., 492 F.3d 600, 602 (5th Cir. 2007) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

[30]  442 F.Supp. 2d 335, 339-41 (S.D. Miss. 2006).

[31] See, e.g., Stockstill Boat Rentals, Inc., 492 F.3d at 602 (holding that plaintiff had not "identified a genuine issue of material fact that, if proved, would satisfy the threshold element of his . . . claim").