**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 18-2297 and 18-2323
_____

PENNSYLVANIA PROFESSIONAL LIABILITY JOINT
UNDERWRITING ASSOCIATION

v.

GOVERNOR OF THE COMMONWEALTH OF
PENNSYLVANIA,
THE GENERAL ASSEMBLY OF THE
COMMONWEALTH OF PENNSYLVANIA
     (Intervenor in District Court)

  Governor of the Commonwealth of Pennsylvania,
         Appellant in 18-2297

  The General Assembly of The Commonwealth of
      Pennsylvania,
         Appellant in 18-2323

_____

Nos. 19-1057 and 19-1058
_____

PENNSYLVANIA PROFESSIONAL LIABILITY JOINT
UNDERWRITING ASSOCIATION

v.

GOVERNOR OF PENNSYLVANIA; THE GENERAL
ASSEMBLY OF THE COMMONWEALTH OF
PENNSYLVANIA; PRESIDENT PRO TEMPORE
PENNSYLVANIA SENATE; MINORITY LEADER
PENNSYLVANIA SENATE; SPEAKER PENNSYLVANIA
HOUSE OF REPRESENTATIVES; MINORITY LEADER
PENNSYLVANIA HOUSE OF REPRESENTATIVES;
INSURANCE COMMISSIONER PENNSYLVANIA

President Pro Tempore Pennsylvania Senate;
Minority Leader Pennsylvania Senate; Speaker Pennsylvania
House of Representatives, Minority Leader Pennsylvania
House of Representatives,
                                        Appellants in 19-1057

                        Governor of Pennsylvania,
                        Insurance Commissioner Pennsylvania,
                                        Appellants in 19-1058
                        _____

                Nos. 21-1099, 21-1112, and 21-1155
                        _____

PENNSYLVANIA PROFESSIONAL LIABILITY JOINT
UNDERWRITING ASSOCIATION

v.

2

GOVERNOR OF PENNSYLVANIA; GENERAL
ASSEMBLY OF THE COMMONWEALTH OF
PENNSYLVANIA


General Assembly of the Commonwealth of
Pennsylvania,
                              Appellant in 21-1099

Governor of Pennsylvania,
                              Appellant in 21-1112

Pennsylvania Professional Liability Joint Underwriting
Association,
                              Appellant in 21-1155
                  _____


On Appeal from the United States District Court
For the Middle District of Pennsylvania
(D.C. Nos. 1-17-cv-2041, 1-18-cv-1308, and 1-19-cv-1121)
District Judge:  Honorable Christopher C. Conner
                  _____

Argued
November 9, 2022

Before:  CHAGARES, *Chief Judge*, JORDAN, and
          RESTREPO, *Circuit Judges*

(Filed: December 16, 2024)
                  _____

Nicole J. Boland
Pennsylvania State Police
Office of Chief Counsel
1800 Elmerton Avenue
Harrisburg, PA   17110

Sean A. Kirkpatrick
Keli M. Neary
Karen M. Romano
Office of Attorney General of Pennsylvania
Strawberry Square – 15th Floor
Harrisburg, PA   17120
    *Counsel for Governor of Pennsylvania*

Melissa Chapaska
Kevin J. McKoen
Dennis Whitaker
Hawke McKeon & Sniscak
100 North Tenth Street
P.O. Box 1778
Harrisburg, PA   17101
    *Counsel for Pennsylvania Professional Liability*
    *Joint Underwriting Association*

Karl S. Myers
Stevens & Lee
555 City Avenue
Suite 1170
Bala Cynwyd, PA   19004

Michael D. O'Mara
Spencer R. Short
Jonathan F. Bloom
Stradley Ronon Stevens & Young
2005 Market Street – Suite 2600
Philadelphia, PA   19103
     *Counsel for General Assembly of the*
     *Commonwealth of Pennsylvania,*
     *Minority Leader Pennsylvania Senate,*
     *Speaker Pennsylvania House of Representatives,*
     *Minority Leader Pennsylvania House of*
*Representatives,*
     *President Pro Tempore Pennsylvania Senate, and*
     *Insurance Commissioner Pennsylvania*

Karon Sarpolis
365 Rolling Hill Road
Elkins Park, PA   19027
     *Pro Se Amicus*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Nearly fifty years ago, in response to a medical malpractice insurance crisis in the state, the General Assembly of the Commonwealth of Pennsylvania established the Joint Underwriting Association ("JUA").  The JUA's primary function is to act as a professional liability insurer of last resort for high-risk medical providers, who pay the JUA directly for the policies it issues.  The JUA has never received funding from

5

the Commonwealth. Since its inception, it has amassed through investments a surplus of about $300 million.

Every year from 2016 to 2019, the Commonwealth took legislative action trying either to transfer the JUA's surplus to the Commonwealth's General Fund or to assume control of the JUA.[1] The 2017, 2018, and 2019 statutes – Acts 44, 41, and 15, respectively – are the focus of the appeals before us now. After each of those enactments, the JUA sued various combinations of defendants, including the Commonwealth's Governor, General Assembly, Insurance Commissioner, and four state representatives (together, the Defendants), asserting multiple federal claims. According to the JUA, the Defendants have violated the Takings Clause, the Contract Clause, the First Amendment, and the JUA's rights to procedural and substantive due process.[2] In response to the JUA's challenges, the Defendants asserted, among other things, that the JUA was created by the Commonwealth and cannot assert constitutional claims against its creator. The District Court disagreed and

---

[1] The General Fund holds all money the Commonwealth receives from the Commonwealth Department of Revenue or "any other source" that is not required to be credited to another state fund. 72 P.S. § 302.

[2] Those clauses and amendments are found at the following: Takings Clause, U.S. Const. amend. V; Contract Clause, *id.* art. 1, § 10, cl. 1; First Amendment, *id.* amend. 1; and due process, *id.* amend. XIV.

6

entered an injunction, preventing the enforcement of most of the legislative changes to the JUA.[3]

The primary issue before us in these appeals is whether the JUA is indeed a creature of the Commonwealth beholden only to the Commonwealth; in other words, whether it is a public entity rather than a private one. We hold that it is, because the Commonwealth delegated power to the JUA to support a public purpose within the state insurance market, and because only the Commonwealth has a legally protectable interest in the JUA. As a public entity, the JUA lacks the ability to maintain the constitutional claims it has asserted against the Commonwealth, its creator. Accordingly, and for the reasons explained herein, we will reverse in part, affirm in part, and remand.

## I.    BACKGROUND[4]

Because our analysis of the JUA's public nature must account for its role in the Commonwealth, we begin by explaining the JUA's history, operations, powers, and duties.

---

[3] Portions of the acts unrelated to the JUA survived and are not at issue in this appeal.

[4] This appeal consolidates 3d Cir. Nos. 18-2297, 18-2323, 19-1057, 19-1058, 21-1099, 21-1112, and 21-1155. The joint appendix filed in the appeals from *Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf* (*JUA I*), 324 F. Supp. 3d 519 (M.D. Pa. 2018), and *Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf* (*JUA II*), 381 F. Supp. 3d 324 (M.D. Pa. 2018), is cited as "C.A. No. 18-2297 J.A." The joint appendix filed in the appeals from

### A.     History and Operation of the JUA

The Commonwealth General Assembly established the JUA in 1975 in an effort to make medical professional liability ("MPL") insurance available at a reasonable cost.[5]  The JUA is required to offer MPL insurance to health care providers and entities that "cannot conveniently obtain [MPL] insurance through ordinary methods at rates not in excess of those applicable to [those] similarly situated[.]"[6]    40 P.S. § 1303.732(a).    All insurers authorized to write liability insurance in the Commonwealth must be members of the JUA. *Id.* § 1303.731(a).

---

*Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf* (*JUA III*), 509 F. Supp. 3d 212 (M.D. Pa. 2020), is cited as "C.A. No. 21-1099 J.A."

[5] The JUA was created by the Pennsylvania Health Care Services Malpractice ("PHCSM") Act.  PHCSM Act, P.L. 390, No. 111, § 802 (repealed 2002).  The General Assembly replaced that Act in 2002 with the Medical Care Availability and Reduction of Error ("MCARE") Act, 40 P.S. § 1303.101 *et seq.*, which "established" the JUA as a "nonprofit joint underwriting association," *id.* § 1303.731(a).

[6] According to the record, the JUA's insureds generally fall into four categories: (1) providers with a history of malpractice  occurrences; (2) providers practicing high-risk specialties; (3) providers who have gaps in coverage; or (4) providers reentering the medical profession after the loss or suspension of their licenses or voluntary withdrawal from practice.

By statute, the JUA is supervised by the Insurance Department of Pennsylvania (the "Department") and owes four duties to the Department: (1) to submit a plan of operations to the Commissioner of the Department for approval; (2) to submit rates and any rate modifications to the Department for approval; (3) to offer MPL insurance to health care providers; and (4) to annually file with the Commissioner updated rates for all health care providers, which, in turn, the Commissioner "shall review and may adjust" when calculating annual assessments for the health care providers. *Id.* § 1303.731(b) (incorporating *id.* § 1303.712(f)). The original legislation insulated the Commonwealth from the JUA's debts and liabilities, but Act 41, enacted in 2018 and discussed in Section I.B.2., *infra*, repealed that provision. *Id.* § 1303.731(c).

The "powers and duties" of the JUA are "vested in and exercised by" its Board of Directors. *Id.* § 1303.731(a). According to the JUA's plan of operations, which is subject to the Commissioner's approval, *id.* § 1303.731(b), the Board has no more than fourteen directors, consisting of the president of the JUA, up to eight member-company representatives elected by the JUA's members, up to four representatives from health care providers or the public nominated by the Board and appointed by the Commissioner, and one agent or broker elected by the JUA's members, *Pa. Pro. Liab. Joint Underwriting Ass'n v. Wolf* (*JUA II*), 381 F. Supp. 3d 324, 328 (M.D. Pa. 2018). The JUA has four employees, none of whom are paid by the Commonwealth; nor do they receive any benefits under the Commonwealth's retirement system. *Pa. Pro. Liab. Joint Underwriting Ass'n v. Wolf* (*JUA III*), 509 F. Supp. 3d 212, 218 (M.D. Pa. 2020). The organization's operating plan states that it may be dissolved by "operation of law" – like any nonprofit in the state, 15 Pa. C.S.A.

9

§ 9134(a)(5) – or dissolved at the request of its members, "subject to the approval of the Commissioner[,]" *JUA III*, 509 F. Supp. 3d at 218. At dissolution, the Board is tasked with determining how the JUA's assets are to be distributed, subject to the Commissioner's approval. *Id.*

The JUA issues insurance policies directly to its policyholders, who pay premiums to the JUA.[7] Those premiums – and the income earned on investments made with them – are now the JUA's sole source of funding; neither its members nor the Commonwealth contribute any money to its operation. The JUA holds "contingency funds" in two separate accounting categories: first, in reserves, which represent the "best estimate" of the funds needed for claims "that have been incurred but not yet paid," and second, in surplus, which is the "capital after all liabilities have been deducted from assets." (C.A. No. 18-2297 J.A. at 613, 2363.)

The JUA's surplus funds underly the disputes here. In December 2016, the JUA's surplus was $268,124,490. By March 2020, it had grown to $298,276,876. By at least one metric, this was an exceptional stockpile. In the insurance business, a risk-based capital ("RBC") ratio is the measure of the sufficiency of an insurer's contingency funds to cover the

---

[7] The policyholders – those who seek insurance from the JUA in its role as a last-resort insurer – are different from the members of the JUA, who join "by virtue of becoming licensed carriers" of liability insurance in Pennsylvania. (C.A. No. 18-2297 J.A. at 308.) The typical JUA policy is limited to one year, with a limit of $500,000 per claim and aggregate limits of $1.5 million for individuals and $2.5 million for hospitals.

10

"full range of potential exposure from [its] claims."[8] (C.A. No. 18-2297 J.A. at 1162.) The Department expects insurers to maintain an RBC ratio of at least 300% of its potential exposure to claims by its policyholders. As of 2017, the JUA's RBC was 13,477%.

Because of that extraordinarily high ratio, the Department sent the JUA a letter about "certain matters involving a lack of regulatory compliance and deviation from sound business practices[.]"[9] (C.A. No. 18-2297 J.A. at 937.) The Department asked the JUA to "determine an efficient amount of surplus to hold in order to run its operation" and to recommend in its plan of operations how it will divest itself of the "excess capital[.]" (C.A. No. 18-2297 J.A. at 938.) In response, the JUA said that the Board would develop and undertake a plan of action to address the excess surplus when so required, but it went on to state that it would be "inappropriate to identify an efficient surplus operating range"

---

[8] A company's RBC ratio is calculated in accordance with a formula that "may adjust for the covariance between" the insurance company's asset, credit, underwriting, and "[a]ll business and other risks[.]" 40 P.S. § 221.4-B. The formula is set by the National Association of Insurance Commissioners, *id.* § 221.1-B, and a company's RBC ratio is generally confidential, *id.* § 221.11-B(a).

[9] At that time, when the JUA held more than $268 million in surplus funds, an auditor recommended that the JUA needed only about $21.5 million in reserves for "unpaid losses" and "unpaid loss adjustment expenses." (C.A. No. 18-2297 J.A. at 1162.)

because of a "lack of legal authority" about how any excess surplus should be handled. (C.A. No. 18-2297 J.A. at 988-89.) The JUA has no policy requiring the distribution of dividends to its policyholders; it has never paid any dividends to its policyholders; nor can it, consistent with statute, pay dividends or make distributions to its members.[10] *See* 15 Pa. C.S.A. § 9114(d) (explaining that nonprofit associations can only use their profits for their nonprofit purposes); *id.* § 9132(a) ("[A] nonprofit association may not pay dividends or make distributions to a member or manager.").

Meanwhile, as we explain below, the legislature made efforts to reach the JUA's surplus capital.

---

[10] In the event of a budget deficit, which has never occurred, the Board must alert the Commissioner. 40 P.S. § 1303.733(a). If the Commissioner approves, the JUA is authorized to borrow the funds needed to satisfy a deficit. *Id.* § 1303.733(b). An earlier version of the JUA's plan of operations, adopted in 2005, explained that the JUA could also fund a deficit by assessing its members in proportion to each member's participation, which the JUA would have to refund when it acquired the necessary funds through a loan or an increase in premiums. The JUA, however, has never borrowed money or assessed its members to fund its operations. Its CEO testified that the Insurance Department advised it to remove the assessment language from its plan of operations, and that the JUA "never intend[s]" to assess its members. (C.A. No. 18-2297 J.A. at 1318, 1470). In 2018, the JUA removed from its plan of operations the specific language about its ability to assess its members.

12

### B.  The Commonwealth's Legislation and the JUA's Lawsuits

The several cases consolidated in this appeal stem from three pieces of legislation and the lawsuits that challenged them.

1. Act 44 of 2017 and *Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf* (*JUA I*), 324 F. Supp. 3d 519 (M.D. Pa. 2018)

In 2017, the legislature passed and the Governor signed Act 44 to implement the annual budget for the Commonwealth. Act of Oct. 30, 2017, P.L. 725, No. 44, § 1 ("Act 44"). Act 44 mandated that the JUA transfer $200 million into the Commonwealth's General Fund.[11]  *Id.* § 1.3.  It required payment by December 1, 2017, or the JUA would be abolished, and its funds transferred to the Commissioner. *Id.* Act 44's legislative findings included that the JUA "has money in excess of the amount reasonably required to fulfill its statutory mandate[,]" that its funds do not belong to its members or policyholders, and that it is an "instrumentality of the Commonwealth[.]" *Id.*

---

[11] Act 44 explicitly repealed Act 85, enacted in 2016, which had also demanded that the JUA transfer $200 million to the Commonwealth. *JUA I*, 324 F. Supp. 3d at 526. The JUA commenced a lawsuit following Act 85's enactment, which has been held in abeyance pending the resolution of these appeals. *Id.*

A week after Act 44's enactment, the JUA sued the Governor in the U.S. District Court for the Middle District of Pennsylvania, seeking declaratory and injunctive relief for violations of the Constitution, specifically, substantive due process, the Takings Clause, and the Contract Clause. The JUA also moved for a temporary restraining order ("TRO") and preliminary injunction against enforcement of the JUA-related section of Act 44. The District Court denied the JUA's request for a TRO and, upon motion by the General Assembly of Pennsylvania, granted leave for the General Assembly to intervene. After a hearing, the District Court granted the motion for a preliminary injunction, declaring that "[t]he uncompensable constitutional exigency imposed by Act 44 is one of extraordinary proportion." *Pa. Pro. Liab. Joint Underwriting Ass'n v. Wolf*, No. 1-17-cv-2041, 2017 WL 5625722, at *11 (M.D. Pa. Nov. 22, 2017).

The parties filed cross-motions for summary judgment. The Governor and General Assembly argued that the JUA could not assert constitutional claims against the Commonwealth because the JUA is nothing more than a creature of the Commonwealth itself.[12] *JUA I*, 324 F. Supp. 3d

_____

[12] The General Assembly argued that the JUA's relationship with the Commonwealth is "sufficiently analogous" to that of a state with a municipality, so that it functions as a political subdivision and cannot bring a claim against its creator. *JUA I*, 324 F. Supp. 3d at 530. The District Court, however, distinguished the JUA from entities that generally fall under the political subdivision doctrine, stating that the JUA "has no power … to tax, to issue bonds, or to exercise eminent domain" and that its mission is "inherently nongovernmental." *Id.* at 531. The District Court also rejected

14

at 529, 532. The JUA responded that it "is not and never has been part of the state," so Act 44 directed a taking of "private property" by the Commonwealth with "no hope of 'just compensation[.]'" (M.D. Pa. 17-2041 D.I. 59 at 13-15.)

The District Court's analysis "beg[an] and end[ed] with the [JUA]'s Takings Clause claim." *JUA I*, 324 F. Supp. 3d at 528. After rejecting the arguments that the JUA was a political subdivision of the Commonwealth, or the Commonwealth itself, the Court found guidance in out-of-circuit cases involving "state-created insurer[s]-of-last-resort" suing their creators.[13] *Id.* at 532-35. The District Court said those cases did not suggest that state creation of an entity was "alone determinative" as to whether the entity was public or private; rather, the courts "holistically examined" the entity's relationship with the state, using a "variety of factors[.]" *Id.* at 535.

Following suit, the Court conducted its own holistic examination of the JUA's relationship with the Commonwealth. It considered the JUA's function, the degree

---

the Governor's argument that the JUA, like Amtrak (a "government entity" for the purposes of 42 U.S.C. § 1983 liability), is a government actor. *Id.* The Court reasoned that the Commonwealth had, at that time, *disclaimed* liability for the JUA and the JUA was not subject to extensive government control, so the comparison to Amtrak was not appropriate. *Id.* at 531-32.

[13] *See infra* Section II.C (discussing out-of-circuit cases).

15

of control reserved to the Commonwealth in contrast with the degree of autonomy granted to the JUA, other aspects of the JUA's treatment by statute, and the nature of the funds in dispute. *Id.* at 535-38. For three reasons, the Court held that the JUA is a "private entity as a matter of law": first, the JUA is, "at its core, an insurance company" comprised of private members, governed by a private board, and supported by private employees; second, the JUA is subject to *de minimis* Commonwealth supervision in that it is only required to seek the Insurance Commissioner's approval of its plan of operations and any plan to borrow funds in case of a deficit; and, third and finally, the JUA is exclusively funded by private premiums, the payment of which has no public end-use. *Id.*

In so ruling, the District Court emphasized the legislature's choices in creating the JUA:

> [I]n the same legislation that created the [JUA], the General Assembly relinquished control thereof. … The legislature had the option to tightly circumscribe the [JUA's] operations and composition of its board, to establish the control of the [JUA] as a special fund[14] … , or to retain

---

[14] The District Court contrasted the Commonwealth's choice not to establish the JUA as a "special fund" with the Commonwealth's choice to create the MCARE Fund as part of the MCARE Act (*see supra* n.5). *JUA I*, 324 F. Supp. 3d at 524. The MCARE Fund is administered by the Commonwealth Insurance Department and is used to "pay claims against participating health care providers for losses or damages awarded in [MPL] actions against them in excess

16

> meaningful control in any number of other ways. That the General Assembly chose to achieve a public health objective through a private association has a perceptible benefit: it assures availability of medical professional liability coverage throughout the Commonwealth at no public cost. By the same token, it also has a consequence: the General Assembly cannot claim *carte blanche* access to the [JUA's] assets.

*Id.* at 538 (citations omitted).

The Court granted summary judgment, declaratory judgment, and permanent injunctive relief to the JUA, holding that the sections of Act 44 related to the JUA were "plainly violative" of the Takings Clause. *Id.* at 540. There was a timely appeal. (C.A. Nos. 18-2297 & 18-2323.)

> 2. Act 41 of 2018 and *Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf* (*JUA II*), 381 F. Supp. 3d 324 (M.D. Pa. 2018)

In 2018, the Commonwealth responded to the District Court's decision by enacting Act 41. That enactment followed a review of the JUA by the Insurance Commissioner that, according to a legislative finding, revealed "a need to modernize the [JUA] in order to produce needed economical

---

of the basic insurance coverage required by" the statute. 40 P.S. § 1303.712(a). It is funded by annual assessments of its participants. *Id.* § 1303.712(i).

17

and administrative efficiencies." Act of June 22, 2018, P.L. 273, No. 41, § 3 ("Act 41"). In Act 41, the Commonwealth expressed its intention to place the JUA "within the [Insurance D]epartment [to] give the [C]ommissioner more oversight of expenditures and ensure better efficiencies" in its operation. *Id.* The Act declared that the JUA "shall *continue* as an instrumentality of the Commonwealth and shall operate under the control, direction[,] and oversight of the [Insurance] Department." *Id.* (emphasis added). Of particular note, Act 41 mandated that the JUA transfer all of its assets to the Department within thirty days of the Act's effective date.[15] *Id.*

The JUA sued the Governor, the Insurance Commissioner, and four state representatives in their official capacities, again alleging violations of substantive due process, the Takings Clause, and the Contract Clause.[16] It sought

---

[15] Act 41 also purported to make changes to the JUA's operations, including restructuring its Board, causing its liabilities to be considered as liabilities against the Commonwealth, installing a new executive director paid by the Commonwealth, and requiring the new Board to submit a new plan of operations for approval. Act of June 22, 2018, P.L. 273, No. 41, § 3.

[16] The JUA also named the General Assembly as a defendant, but counsel did not enter an appearance on its behalf, and it filed no answer. The District Court explained that "[a]ll filings by the [state representatives] have been made solely under the names of the four individual elected leaders and cannot be fairly construed as having been filed on behalf of the General Assembly itself." *JUA II*, 381 F. Supp. 3d at 330 n.2. After the District Court entered its order

---

18

injective and declaratory relief. As in *JUA I*, the District Court denied the JUA's TRO motion but granted its motion for a preliminary injunction. The parties then filed cross-motions for summary judgment.

The District Court granted summary and declaratory judgment and permanent injunctive relief in favor of the JUA, holding that "the Commonwealth cannot take the [JUA's] private property in the manner contemplated by Act 41." *JUA II*, 381 F. Supp. 3d at 342-43. Before discussing Act 41, the District Court reiterated its earlier holding that the JUA and its assets are "overwhelmingly private in nature." *Id.* at 333. It rejected the state representatives' argument that, under *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819), a lack of non-state interests in the JUA means that the Commonwealth can "wield its power [over the JUA], unrestrained by the federal Constitution[.]" *JUA II*, 381 F. Supp. 3d at 336. On the contrary, the Court said, "the state has never been alone interested in [the JUA's] transactions." *Id.* at 337 (internal quotation marks omitted). In the Court's view,

> the record establishes that the [JUA's] members *do* have some interest in [it]. The [JUA] is organized as a nonprofit, and, by law, member companies do not share in profits as they did in [two cited out-of-circuit cases]. The [JUA's]

granting summary judgment to the JUA and permanently enjoining portions of Act 41, the parties stipulated that the order applied to the General Assembly.

19

reserves and its surplus are its first line of financial defense in the event it suffers a loss. But thereafter, it is the [JUA's] member insurance companies, *not* the Commonwealth, that would be held to account: under the [JUA's] current plan of operations, members may be assessed to make up any loss until the [JUA] can borrow sufficient funds to satisfy its deficit, repay borrowed funds, and reimburse members for assessments. Although the degree of member interest is not as enduring or direct as the member interest in [the out-of-circuit cases], it is member interest nonetheless and belies defendants' assertion that the state is "alone" interested in the [JUA].

*JUA II*, 381 F. Supp. 3d at 339 n.7 (internal citations omitted).

The Court also rejected the Governor's and Commissioner's argument that Act 41 was a valid response to the holding of *JUA I*. The Court declared that no authority supported the proposition that "the state can declare public what it created as – and a court has confirmed to be – a private entity." *Id.* at 335. As in *JUA I*, the District Court focused only on the JUA's Takings Clause claim, and it said that Act 41 was merely an attempt to do indirectly what the District Court had already told the Commonwealth in *JUA I* it could not do directly.[17] *Id.* at 341. Again there was a timely appeal. (C.A. Nos. 19-1057 & 19-1058.)

_____

[17] The JUA had argued that issue preclusion applied to the suit, but the District Court held that the issues in *JUA I* were not identical to those in *JUA II* because the legislative act and

20

3. Act 15 of 2019 and *Pennsylvania Professional Liability Joint Underwriting Ass'n v. Wolf* (*JUA III*), 509 F. Supp. 3d 212 (M.D. Pa. 2020)

The wheel turned again in 2019, with the passage of Act 15, which, unlike its predecessors, did not mandate the transfer of the JUA's surplus to the Commonwealth.  Act of June 28, 2019, P.L. 101, No. 15, § 7 ("Act 15").  Instead, the Act requires the JUA to be funded by the Commonwealth and that it submit and testify to a budget estimate annually. *Id.*  It also mandates that the JUA's Board hold quarterly public meetings as required by the state's Sunshine Act,[18] and that the JUA be considered as a "Commonwealth agency" for the purposes of the Commonwealth Attorneys Act[19] and other state statutes. *Id.*  Finally, Act 15 requires the JUA to share a list of its

constitutional question had changed. *JUA II*, 381 F. Supp. 3d at 334-35 ("[T]he dispositive inquiry [in *JUA II*] is '[w]hether the Commonwealth can now recapture the [JUA] through *post hoc* legislation – irrespective of private rights and interests accrued by the [JUA] over more than four decades' – without constitutional consequence." (third alteration in original)).

[18] The Sunshine Act requires that "[o]fficial action and deliberations by a quorum of the members of an agency shall take place at a meeting open to the public[.]" 65 Pa. C.S.A. § 704.

[19] The Commonwealth Attorneys Act requires the Pennsylvania Attorney General to represent all Commonwealth agencies "in any action brought by or against the Commonwealth or its agencies[.]" 71 P.S. § 732-204(c).

21

employees with the Commonwealth, conduct operations in Commonwealth-owned facilities, and meet the requirements of the Department of Revenue for employees with access to tax information. *Id.*

Predictably, the JUA again sued the Governor and the General Assembly, this time seeking declaratory and injunctive relief for violations of substantive and procedural due process, the Takings Clause, the Contract Clause, and the First Amendment. Unlike in *JUA I* and *JUA II*, the District Court denied the JUA's preliminary injunction and TRO motions because "Act 15 posed no threat of imminent and irreparable harm." *JUA III*, 509 F. Supp. 3d at 221. The parties then filed cross-motions for summary judgment.

In its summary judgment opinion, the District Court once more repeated its holding from *JUA I* that the JUA is a private entity with private property. *Id.* at 222. It described Act 15 as "test[ing] the outer bounds of [the *JUA I* and *JUA II*] holdings, tasking [the Court] to consider what degree of authority, if any, the Commonwealth may assert over the [JUA]." *Id.* The answer largely went against the Commonwealth, again.

The District Court held that Act 15's funding of the JUA through the Commonwealth budget, as well as the requirement that the JUA submit and testify to its planned expenses, constituted a regulatory taking. *Id.* at 223-27 ("By prohibiting the [JUA] from spending its private funds as it might choose, Act 15 deprives the [JUA] of … essential property rights."). The District Court also held that the categorization of the JUA as a Commonwealth agency for purposes of the Commonwealth Attorneys Act violated the JUA's First

22

Amendment right to consult with and hire civil counsel of its choice. *Id.* at 228-31. The Court accordingly granted a permanent injunction against the implementation of those portions of the Act. *Id.* at 235.

The District Court did, however, rule for the Defendants on the provisions of Act 15 having to do with the JUA's disclosures to the public and the Commonwealth.[20] Those provisions did not constitute a violation of substantive due process. *Id.* at 231-34. Clarifying its earlier decisions, the Court said: "In holding that the [JUA] is a private entity and its funds private property, we rejected defendants' claim that the [JUA] is the state itself. We have never denied, however, that the [JUA] is a unique creature – a state-created private entity that furthers the General Assembly's public-health objectives." *Id.* at 232. While reasserting that the JUA's property and operations are private, the Court acknowledged that the "*mission* [of the JUA] is indisputably public[,]" so the Commonwealth's oversight and support in the form of the remaining provisions of Act 15 survived rational-basis review. *Id.* at 232-33. Both sides timely appealed the Court's order. (C.A. Nos. 21-1099, 21-1112, & 21-1155.)

---

[20] In addition to upholding the disclosure provisions of Act 15, the District Court also ruled for the Defendants on the JUA's Contract Clause claim, which it deemed to be moot. *JUA III*, 509 F. Supp. 3d at 227 n.6. Those rulings coincide with paragraph five of the District Court's separate judgment order, in which it granted summary judgment in favor of the Defendants as to the JUA's substantive due process (Count I) and Contract Clause (Count III) claims. We will affirm that portion of the District Court's order.

We consolidated the appeals from the three *JUA* cases and held oral argument. We then stayed the appeals and certified to the Pennsylvania Supreme Court the question of whether the JUA is, under Pennsylvania law, a public or private entity. That court declined to answer the question, saying the issue is "principally one of federal law." *Pa. Pro. Liab. Joint Underwriting Ass'n v. Governor of the Commonwealth*, 310 A.3d 74, 76 (Pa. 2024). We now decide the merits of the appeals.

## II.   DISCUSSION[21]

On appeal, the Defendants argue that the District Court erred in holding that the JUA is a private entity with constitutional rights it can assert against its creator, the Commonwealth. They argue, as they repeatedly have, that the JUA is a "creature of the state" and without such rights. In response, the JUA maintains that it is a private entity and that its assets and operations are largely beyond the reach of the

---

[21] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over the District Court's grant of summary judgment and apply the same standard as the District Court. *Hayes v. N.J. Dep't of Hum. Servs.*, 108 F.4th 219, 221 (3d Cir. 2024). Summary judgment is appropriate if, when viewed in the light most favorable to the non-moving party, there is no genuine issue of material fact and "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). We may affirm on any ground supported by the record. *Hughes v. Long*, 242 F.3d 121, 122 n.1 (3d Cir. 2001).

Commonwealth. It further says that the way the Commonwealth created and has regulated the JUA over decades has "created … conditions under which [it] *acquired* the right to protection from uncompensated takings." (C.A. 18-2297 Answering Br. at 31 (emphasis added).) While the case presents complexities that the District Court addressed with great care, we conclude that the Commonwealth has the better of the arguments.

> **A.** ***Dartmouth College* provides the analytical approach for determining whether the JUA is a public or private entity.**

The crux of this protracted litigation is the status of the JUA: whether it is a public entity akin to a state agency or is instead a private entity with the ability to sue the Commonwealth for the violation of constitutional rights. To make that determination, we first must identify the proper analytical approach.

We begin by looking back more than two centuries to a case all the parties rely on: *Trustees of Dartmouth College v. Woodward*, 17 U.S. (4 Wheat.) 518 (1819). There, the Supreme Court considered whether Dartmouth College, a privately founded institution incorporated by charter from the British government, could be converted to a public institution by an act of the New Hampshire legislature some fifty years after the College's founding. *Id.* at 552-55, 626. When the state tried to take it over, the College, through its trustees, sued, alleging a violation of the Constitution's Contract Clause. *Id.* at 626-27.

25

In considering whether Dartmouth College was a creature of the state subject to public control, the Supreme Court inferred nothing from the fact that the King of England granted a charter to incorporate the college. *Id.* at 638. Instead, the Court postulated a series of conditions that would qualify the College as a public institution.

> If the act of incorporation be a grant of political power, if it create a civil institution, to be employed in the administration of the government, or if the funds … be public property, or if the state … , as a government, be alone interested in its transactions, [then] the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the [C]onstitution of the United States.

*Id.* at 629-30.

We take the cited conditions to be four guiding questions in the identification of a public entity subject to the control of the legislature. The first two questions, about the act of incorporation, ask whether the entity was granted political power or was created to be employed in the administration of government. The third asks whether the funds of the entity are public property, and the fourth and final question examines whether only the state has an interest in the entity. In short, the ends and means of the institution, as of the time it was established, are strong indicators of whether it is public or private.

26

Because an individual benefactor founded Dartmouth College as a private charitable corporation, endowed by private funds, the founder "could scarcely be considered as a public officer, exercising any portion of those duties which belong to the government[.]" *Id.* at 634. Although the purpose of the institution was education, "an object of national concern," the state could not "have supposed[] that [the founder's] private funds, or those given by others, were subject to legislative management," nor were the professors considered public officers merely by being employed to educate the youth. *Id.* at 634-35. Dartmouth College, at its creation and incorporation, was founded for private purposes – "[t]he particular interests of New Hampshire never entered the mind of the donors, never constituted a motive for their donation" – so, the Court concluded, the College was not created as a "civil institution, participating in the administration of government[.]" *Id.* at 640-41. The only power bestowed by the act of incorporation was the trustees' perpetual power to promote the purpose of the College. *Id.* at 636, 641. That power did not assume a political character merely because the government granted a charter for Dartmouth to operate. *Id.* at 636-38.

In examining whether only New Hampshire had an interest in Dartmouth College, the Court reasoned that while the original founder, land donors, and "fluctuating" student population maintained no "vested interest" assertable in court, the private corporation itself, as an "assignee of [the] rights" of the donors, did. *Id.* at 641-42. It stood in the founders' place and "distribute[d] their bounty, as they would themselves have distributed it[.]" *Id.* at 641-42. The corporation also served as a trustee for the students by exercising, asserting, and protecting their interests. *Id.* at 643. The corporation, administered by its trustees, thus held the "whole legal

27

interest[,]" *id.* at 645, and those trustees were capable of guiding and governing the institution as needed, outside of the "correcting and improving hand of the legislature," *id.* at 648; *see id.* at 653 (explaining that the trustees were acting as assignees of the donors and founders, but also in their own interests as potential professors or leaders of the college).

Having considered the questions it posed for itself, the Supreme Court ruled in favor of the College. Because Dartmouth was founded as a private charity with private funds, without being granted political power or exercising it, and New Hampshire was not alone interested in it, the Supreme Court held that the state's attempt to convert it to a public institution implicated and violated the Contract Clause. *Id.* at 650, 654.

One of our sister circuits has applied *Dartmouth College* to determine whether an entity like the JUA could assert constitutional rights against its creator. In *Texas Catastrophe Property Insurance Ass'n v. Morales*, 975 F.2d 1178 (5th Cir. 1992), the Fifth Circuit was asked whether a state-created property insurance association had a right to retain counsel in civil cases and could assert that right against the state. The Texas legislature established the association to provide property insurance in designated regions, and all property insurers in the state were required to join it. *Id.* at 1179. The association received no funds from the government, and it wrote its own policies and paid its own claims. *Id.* When the legislature amended the association's organic statute to require the association to use the Texas Attorney General as legal counsel, the association sued, alleging a violation of its constitutional rights. *Id.* at 1180.

28

Relying on the guidance of *Dartmouth College*, the Fifth Circuit examined the "identity" of the association to determine if it could bring the claim. *Id.* at 1182. The Fifth Circuit emphasized that the association's statutory scheme allowed its members to receive distributions from its profits and, if a deficit occurred, to be assessed. *Id.* ("When [the association] loses, the bank accounts of its members are depleted, not the public treasury."). Because the member companies were "vitally interested" in protecting their money – and that protection related to their ability to choose the association's counsel – "the State of Texas [was] not alone interested in the [association's assets]." *Id.* at 1183 (citing *Trs. of Dartmouth Coll.*, 17 U.S. (4 Wheat.) at 629-30)). The Fifth Circuit also concluded that the act creating the association was not a grant of political power, nor was the association employed in the administration of government. *Id.* The association thus was not "truly a part of the state" and could sue Texas for the alleged deprivation of a constitutional right. *Id.*

In *JUA I*, the District Court likewise rejected the argument that the JUA was a creature of the state because, applying *Dartmouth College*, it determined that the relationship between the JUA and the Commonwealth was not "sufficiently analogous" to that of a state and its municipalities.[22] 324 F. Supp. 3d at 530. In *JUA II*, the District

---

[22] That "sufficiently analogous" language comes from *Pocono Mountain Charter School v. Pocono Mountain School District*, 908 F. Supp. 2d 597 (M.D. Pa. 2012). *JUA I*, 324 F. Supp. 3d at 530-31. In *Pocono Mountain*, the district court considered whether a charter school could sue the state under § 1983 by asking whether the school was "sufficiently

Court again dismissed the idea that the JUA is a "governmental instrument" under *Dartmouth College*, saying it "does not neatly fit into any of the categories of public entities described" therein. 381 F. Supp. 3d at 337. The Court declared that the state has "never been 'alone interested in [the JUA's] transactions.'" *Id.* On appeal, all of the Defendants urge us to adopt *Dartmouth College*'s guiding questions to determine whether the JUA is a public institution. The JUA also cites *Dartmouth College* but argues that it embodies a holistic analysis, correctly reflected in the District Court's decisions.

Unlike the District Court, we do not read *Dartmouth College* as prescribing categories into which an entity must entirely fall to be considered public. Whether labeled holistic or not, the analysis should indeed follow *Dartmouth College*, and that is best done by considering the four questions just discussed. Tailored to the case before us, they ask (1) whether the JUA's organic act granted it political power, (2) whether the JUA was created to be employed in the administration of government, (3) whether the JUA's funds are drawn from public property, and, finally, (4) whether anyone but the Commonwealth has an interest in the JUA.

---

analogous to a municipality." 908 F. Supp. 2d at 606. The court considered the school's relationship with the school district and state, *id.* at 611, and held that the school could not file suit because it operated within the authorization of the school district for a limited purpose, *id.* at 612. In *JUA I*, the District Court noted that "no case has extended *Pocono Mountain* beyond its charter school context." 324 F. Supp. 3d at 530.

30

### B. The JUA is a public entity without the ability to assert constitutional claims against the Commonwealth.

We take up *Dartmouth College*'s four guiding questions in turn.

First, we ask whether the JUA's organic act granted it political power.[23] *Trs. of Dartmouth Coll.*, 17 U.S. (4 Wheat.) at 629. Although not a grant of political power in the traditional sense, since its inception, the JUA has held and exercised the coercive power of the state in its ability to require all MPL insurers who choose to do business in the Commonwealth to take certain actions.[24] Insurers have to become members of the JUA whether they like it or not, and the organic act for the JUA required the members to share the initial costs of the organization's operation among themselves. PHCSM Act, P.L. 390, No. 111, § 802 (repealed 2002). The JUA also exercises the Commonwealth's power in requiring the member-companies to provide affordable MPL insurance to providers who would otherwise be unable to conveniently obtain it in the "ordinary insurance market." *Id.* § 801; 40 P.S. § 1303.732(a). The Commonwealth granted the JUA its power, which is vested in and exercised by the JUA's Board of Directors, 40 P.S. § 1303.731(a), to carry out the public purposes of the original legislation and its successor statute, the

---

[23] The District Court did not consider this aspect of *Dartmouth College* in any of its JUA decisions.

[24] Recall that "MPL" is an acronym for medical professional liability.

31

MCARE Act, *id.* § 1303.102; PHCSM Act, § 102. The exercise of such power on behalf of the Commonwealth for a public purpose suggests that the JUA is a public entity.

Second, we consider whether the JUA was created as a civil institution to be employed in the administration of government. *Trs. of Dartmouth Coll.*, 17 U.S. (4 Wheat.) at 629. The District Court concluded that the JUA was not created or employed as such. *JUA II*, 381 F. Supp. 3d at 337. We disagree. While the JUA is not a state agency in the traditional sense, Pennsylvania established the entity in 1975 to ensure that health care providers could obtain MPL insurance at a reasonable cost and that victims of medical negligence would promptly receive fair compensation. PHCSM Act, § 102. The General Assembly reiterated those two goals in 2002 with the enactment of the MCARE Act, the purpose of which is to make medical care available in the Commonwealth through a "comprehensive and high-quality health care system." 40 P.S. § 1303.102(1). In addition to affordable MPL insurance and fair compensation for victims of medical negligence, the health care system must include "[a]ccess to a full spectrum of hospital services and to highly trained physicians in all specialties … across th[e] Commonwealth." *Id.* §§ 1303.102(2)-(4). Recognizing and furthering those goals are "essential to the public health, safety[,] and welfare of all the citizens" of the Commonwealth. *Id.* § 1303.102(6).

The JUA is integral to the Commonwealth's administration of a highly regulated, safe, and accessible health care system: it ensures that health care providers in high-risk specialties or reentering practice can and will do business in the Commonwealth, where obtaining required insurance

32

coverage would otherwise be cost-prohibitive. *Id.* § 1303.732(a). The General Assembly thus employed the JUA to serve as an essential piece of its supervision of the Commonwealth's insurance market and health care system, supporting the public good by serving as a safety net for both medical providers and the patients they serve. We are, of course, not suggesting that entities involved in the insurance or health care markets are, by that fact alone, necessarily public institutions, even when the government may have a hand in their formation. There can be gradations of government involvement, so a fact-specific determination is required. In this instance, we believe that the Commonwealth's creation and use of the JUA for the stated purposes indicates that it can rightly be considered a feature of the Commonwealth's government and hence as a public institution.

Third, we ask whether the JUA's funds are drawn from public property. *Trs. of Dartmouth Coll.*, 17 U.S. (4 Wheat.) at 629-30. In considering this aspect of *Dartmouth College*, the District Court concluded that the JUA has "never been funded by or endowed with 'public property'[.]" *JUA II*, 381 F. Supp. 3d at 337. And, true enough, it is undisputed that the JUA has not drawn on the public fisc. *Id.* at 328. Taking account of "the nature of the funds in dispute[,]" the District Court thus held that the JUA's surplus is private property. *JUA I*, 324 F. Supp. 3d at 537-38. But an essential piece is missing from that reasoning: the JUA's funds are not simply private money exchanged among private individuals and entities in a typical insurance market. The funds are the result of the Commonwealth's acquisition of policyholders' premium payments for a public purpose. Although not public in the traditional sense, the JUA's funds exist only to support the goals of the Commonwealth as set forth in the JUA's organic

33

act and, later, the MCARE Act – to make available a comprehensive and high-quality health system in the Commonwealth, one aspect of which is to ensure access to affordable MPL insurance. 40 P.S. §§ 1303.102(1), (3). To the extent the JUA's surplus could be considered profits, the JUA must use the funds for its nonprofit purpose, which is to provide MPL insurance as dictated by the MCARE Act. 15 Pa. C.S.A. § 9114(d). As discussed *infra*, the JUA's obviously excessive surplus provides no profits or dividends to anyone, and no private party risks damage to its bank account should that surplus be reduced to a reasonable level. The funds exist as the result of the Commonwealth's enforced acquisition of premiums for a public purpose, which, again, indicates that the JUA is public in nature. That the premiums thus received are augmented by returns on those same funds once invested does not change that.

Finally, fourth, we consider whether anyone but the Commonwealth has an interest in the JUA. *Trs. of Dartmouth Coll.*, 17 U.S. (4 Wheat.) at 630. In *JUA II*, the District Court explained that the JUA's members have an interest in the JUA because they may be assessed if the JUA suffers a deficit. 381 F. Supp. 3d at 339 n.7. That statement is the only support for the District Court's finding that the state has "never been 'alone interested in [the JUA's] transactions.'" *Id.* at 337. The Governor and Insurance Commissioner have a persuasive riposte. They asked: "Suppose one sought to purchase [the] JUA. To whom would they write the check?" (Exec. Def. C.A. 18-2297 Opening Br. at 33.) And the answer, they said, is not the members, the Board, or the JUA itself. The JUA has no beneficiaries or donors. So the question stands: Were the JUA able to be sold, who besides the Commonwealth would be entitled to receive the profit from the sale?

34

Both in its Answering Brief and at oral argument, the JUA resisted engaging with that hypothetical. It said that, as an unincorporated nonprofit association, the JUA "exists for the benefit of its purpose" and "it cannot be bought or sold in any traditional sense." (C.A. 18-2297 Answering Br. at 57.) That, of course, avoids rather than answers the question. But the Defendants' point remains even if we shift the hypothetical from selling the JUA to dissolving it by operation of law or at the request of its members, as allowed by its plan of operations. Its assets would then be "distributed in such a manner as the Board may determine subject to the approval of the Commissioner." (C.A. No. 21-1099 J.A. at 180.) It is difficult to imagine where the assets, including the surplus, would go except to the Commonwealth, as the JUA has no private stakeholders, no property in trust, and no charitable purpose. *Cf.* 15 Pa. C.S.A. § 9135(1)-(5) (explaining the requirements for winding up a nonprofit association). Even if the Board directed that the property be distributed to the JUA's members, it seems most unlikely that the Commissioner would approve that plan. *But see JUA I*, 324 F. Supp. 3d at 538 (finding "no merit" in this possibility because it rested on too many assumptions). At oral argument, the JUA said that the General Assembly theoretically could dissolve the JUA, and the surplus would somehow go to its nonprofit purpose, which it did not specify but conceded was to benefit the public.

The JUA argues that the member assessments to which the District Court referred in *JUA II* are enough to create a non-state interest in the JUA.[25] *See JUA II*, 381 F. Supp. 3d at 339

---

[25] The JUA also makes a general argument that its members have a reputational interest in "minimizing public

n.7. According to the JUA's prior plan of operations, in the case of a deficit, the Board could issue assessments to members in proportion to their participation in the insurance pool. But the JUA's CEO testified that the JUA has never assessed its members, "never intend[s] to" assess its members, and has been told by the Insurance Department to remove the assessment language from its plan; she further stated frankly that she did not "believe that [the JUA has] the statutory power to assess the members." (C.A. No. 18-2297 J.A. at 1318, 1470-72.) In fact, as the JUA conceded at oral argument, the plan of operations as amended in 2018 excluded the member-assessment language.[26]

The Governor and Insurance Department argue that whether the JUA's members have a true possibility of being assessed – and thus perhaps have an interest in the JUA's funds – is a disputed fact that should be viewed in the light most favorable to them on summary judgment. The JUA responds that the prior plan said what it said, despite its own CEO's

_____

criticism of the [MPL insurance] industry[,]" which, the JUA says, represents a pecuniary interest. (Answering Br. C.A. 18-2297 at 55-56.) The JUA offers no evidentiary support for its assertion that its members would suffer monetary losses from public criticism if the JUA did not exist.

[26] The JUA stated at oral argument, however, that, although the JUA complied with the Commissioner's mandate to remove the language permitting the Board to assess its members, the 2018 plan still somehow gives the Board broad power to "levy assessments[.]" (*Compare* C.A. No. 18-2297 J.A. at 233 *with* C.A. No. 21-1099 J.A. at 177.)

testimony indicating that there is no reason to believe any assessments will ever occur. Neither side has it right, and, in particular, the Defendants' categorization of the assessments as a disputed fact is incorrect. Instead, as the JUA's CEO indicated in her testimony regarding the legal authority of the JUA to issue assessments, the question is one of law – whether the JUA has statutory authority to assess its members.

The statute does not include any language about assessments. 40 P.S. § 1303.733. It merely says that, if the JUA were to experience a deficit, it could be authorized to borrow funds – but not from whom. *Id.* § 1303.733(b). The JUA's authority to assess costs from its members is at best ambiguous, and, given that the JUA has never sought to assess its members, and "never intend[s]" to do so, setting up possible assessments as evidence of a valid non-state interest vastly exaggerates the hypothetical assessments' importance. (C.A. No. 18-2297 J.A. at 1470.)

In the end, the JUA's possible financial booms and busts do not give its policyholders or members a legal interest in its assets. The JUA fails to identify any other legally protectable interest on behalf of anyone but the Commonwealth. As far as we can tell, the Commonwealth, which created the JUA as part of its broader legislative scheme to maintain a high-quality health care system, is the only one with an interest in the JUA.

In sum, Pennsylvania established the JUA to serve an integral role in the administration of the Commonwealth's insurance market and, consequently, in the health care market too. In doing so, it imbued the JUA with the coercive power

37

of state government to compel private insurance companies to take specific actions. The JUA's funds are the result of the Commonwealth's enforced acquisition of funds to support those goals, and only the Commonwealth has a legally protectable interest in the JUA and its resources. We thus hold that, under *Dartmouth College*'s guidance, the JUA is a public institution and is without the ability to maintain the constitutional claims it has asserted against the Commonwealth.[27]

---

[27] Pursuant to the principles of federalism, the Commonwealth can amend and repeal its JUA-related legislation as it sees fit, free from interference by federal courts. *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546 (1985) ("The genius of our government provides that … the people – acting not through the courts but through their elected representatives – have the power to determine as conditions demand, what services and functions the public welfare requires.") (quoting *Helvering v. Gerhardt*, 304 U.S. 405, 427 (1938) (Black, J., concurring)). As the District Court observed, however, the Commonwealth's freedom to experiment is not without limits. *JUA II*, 381 F. Supp. 3d at 340-41. A party with standing may object to the constitutionality of the Commonwealth's actions and may seek redress in federal court. *Bond v. United States*, 564 U.S. 211, 222 (2011) ("[F]ederalism protects the liberty of the individual from arbitrary power. When government acts in excess of its lawful powers, that liberty is at stake."); *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (explaining that a federal court "must refrain from passing upon the constitutionality of an act" unless "the question is raised by a party whose interests entitle him to raise it") (quoting *Valley*

38

## C. The District Court relied on cases that are distinguishable.

Finally, for completeness, we consider the District Court's reliance on certain out-of-circuit precedents that the Defendants argue are distinguishable from the present case. We agree with that critique.

### 1. *Asociación*, *Arroyo-Melicio*, and *Morales*

First, the District Court discussed *Asociación De Subscripción Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007), wherein the First Circuit concluded that Puerto Rico's association for automobile liability insurance could bring a takings claim against the territory, because the association was "private in nature" and thus had standing to allege a constitutional violation. *Id.* at 9, 20. That conclusion relied on the First Circuit's earlier decision in *Arroyo-Melicio v. Puerto Rican American Insurance Co.*, 398 F.3d 56, 62 (1st Cir. 2005), which the District Court categorized as "expound[ing] the nature of the association's relationship with the government." *JUA I*, 324 F. Supp. 3d at 533. **[C.A. No. 18-2297 J.A. at 31.]**

But the discussion in *Arroyo-Melicio* is just that – a discussion of the characteristics of an insurance arrangement within a specific statutory scheme, all for the purpose of considering federal antitrust claims. 398 F.3d at 60-62. The

*Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 474 (1982)) (cleaned up).

39

First Circuit engaged in no analysis of the association's status as a public or private entity; it did not have to. The statute that created that association and its relevant rules stated that it was "a private association," had the "general corporate powers of a private corporation," 26 L.P.R.A. §§ 8055(a), (g), and was "for-profit," Off. of Comm'r of Ins., P.R. Reg. No. 6254(2)(c) (2000). The plaintiffs in *Arroyo-Melicio* did not dispute the association's private status. The First Circuit's statement that the association "is not an agency of" Puerto Rico resulted merely from reading the statute and regulations creating it, not from any analysis of its characteristics. *Arroyo-Melicio*, 398 F.3d at 60-62. The District Court's reliance on *Asociación* and *Arroyo-Melicio* was thus misplaced.

Second, the District Court discussed *Texas Catastrophe Property Insurance Ass'n v. Morales*, 975 F.2d at 1183. *JUA I*, 324 F. Supp. 3d at 533. As discussed in Section II.A., *supra*, the Fifth Circuit applied *Dartmouth College* in that case to determine whether a state-created property insurance association could assert a constitutional claim against its creator. *Morales*, 975 F.2d at 1182. The analysis fundamentally focused on the fact that Texas was not alone interested in the association's assets because the association's member companies shared in its profits and losses. *Id.* at 1183 (citing *Dartmouth*, 17 U.S. (4 Wheat.) at 629-30). The Fifth Circuit mentioned the other aspects of the association as background, *id.* at 1179-80, but, as in *Arroyo-Melicio*, the insurance scheme in *Morales* differed from the JUA in a particularly significant way: as established by the association's organic statute, the member companies shared in the profits and losses of the association. *Morales*, 975 F.2d at 1182; *see also Arroyo-Melicio*, 398 F.3d at 62. The entities at issue in both cases are thus expressly subject to the interests of their

40

members – differentiating them from a public institution under *Dartmouth College*. *See supra* Section II.A. Those cases therefore do not answer the "public-versus-private entity" question on the facts before us.

## 2. *MMIA* and *MSLA*

The District Court also discussed the treatment of an unincorporated insurance association in *Medical Malpractice Insurance Ass'n v. Superintendent of Insurance of State of New York*, 533 N.E.2d 1030 (N.Y. 1988) ("*MMIA*"). *JUA I*, 324 F. Supp. 3d at 533-34. There, the New York Court of Appeals considered whether a legislative scheme requiring an MPL insurance underwriting association to run at a deficit was a confiscation of property in violation of the Takings Clause. *MMIA*, 533 N.E.2d at 1036. Because those deficits were "expressly contemplated in the enabling legislation[,]" the court rejected the association's claim that the deficit was confiscatory.[28] *Id.* at 1037.

In *JUA I*, the District Court discussed *MMIA*, contrasting what it called the "exhaustive statutory framework dictating the composition of [the association's] board and its plan of operations and authorizing the superintendent of insurance to unilaterally order amendments to the plan" at issue

---

[28] The members, who were required to "make up" a deficit incurred by the association, were not parties to the suit, so the court did not consider whether the statutory scheme was confiscatory as to them. *Med. Malpractice Ins. Ass'n v. Superintendent of Ins. of State of N.Y.* (*MMIA*), 72 N.Y.2d 753, 767 (N.Y. 1988).

41

there with the Pennsylvania legislature's choice not to "tightly circumscribe the [JUA's] operations and composition of its board[.]" *JUA I*, 324 F. Supp. 3d at 534, 538. The District Court reiterated those differences in *JUA II*, stating, "[i]n stark contrast to *MMIA*, the [JUA] is subject to minimal supervision by the Commissioner, in a manner not meaningfully different from private insurers." 381 F. Supp. 3d at 340.

But the court in *MMIA* did not address the question before us. It assumed the insurance association could bring federal constitutional claims against its creator, then considered the characteristics of that association's funds for the purposes of ruling on the substance of those constitutional claims. *MMIA*, 533 N.E.2d at 1036-37. Although the court identified the association as a "creature of statute," *id.* at 1036, it did not engage with the threshold issue of whether that creature was public and had the ability to assert constitutional claims against the state, so *MMIA* is inapposite.

Finally, the District Court discussed *Mississippi Surplus Lines Ass'n v. Mississippi*, 261 F. App'x 781 (5th Cir. 2008) ("*MSLA*"). In that case, upon the request of the state's Insurance Commissioner, a group of private individuals formed a nonprofit association to assist the Commissioner with regulating the surplus line insurance market. *Id.* at 783. The statute allowed the association to levy fees on premiums, subject to approval by the Commissioner, which the association then used for operating expenses. *Id.* at 784. When the association accumulated excess funds through those fees, the state amended its code to authorize the transfer of $2 million to the state. *Id.* The Fifth Circuit, in determining whether the *funds* were private or public property, explained that "the [association] and its funds exist at the whim of the

42

legislature and are public in nature[,]" so the association had no right to the funds. *Id.* at 785, 788.

Like the court in *MMIA*, the Fifth Circuit in *MSLA* did not wrestle with whether the association itself was public or private for the purpose of determining whether it could assert constitutional claims against the state. Although it acknowledged that "the private or public nature of the organization is a necessary step in an inquiry when an entity acting for a state initiates legal action against the state[,]" *id.* at 785 (discussing *Morales*, 975 F.2d at 1182), it did not conduct that analysis nor determine whether the association could bring a claim against the state in the first place. Rather, the court considered whether the funds were public or private only for the purpose of ruling on the merits of the association's constitutional claims. *Id.* at 787-88 ("Because [the association] did not have a property right in the $2 million in excess fees that the State appropriated, the legislature did not deprive them of a property right without due process of law."). In short, the court in *MSLA* did not engage with the question central in each of the *JUA* cases: whether the entity in question is public or private for the purpose of determining whether it can bring a constitutional claim against its creator.

In sum, given the facts we have here, the cases relied on by the District Court appear to give little guidance, so we decline to endorse the conclusions the District Court reached based on them.

### III.   CONCLUSION

For the foregoing reasons, we will reverse in part, affirm in part (as stated in footnote 20, *supra*), and remand for further proceedings consistent with this opinion.